S07A0689. THE STATE v. PYE.
S07A0894. THE STATE v. CHAMBERS.
(653 SE2d 450)

HINES, Justice.

These appeals stem from criminal prosecutions in connection with the death of Maynon Freeman. In a fifteen-count indictment,

defendants Darrien Jaron Pye and Lorenzo F. Chambers were indicted, inter alia, on charges of felony murder, aggravated assault, armed robbery, and hijacking a motor vehicle.[1] Pye and Chambers each moved to suppress oral and written statements they had given the police, and, in identical, consolidated orders, the trial court granted the motions. In Case No. S07A0689, the State appeals from the trial court's order in the prosecution of Pye, and, in Case No. S07A0894, the State appeals from the order in Chambers's case. See OCGA § 5-7-1 (a) (4).[2] For the reasons that follow, we affirm in part and reverse in part in Case No. S07A0689, and affirm in Case No. S07A0894.

The State asserts that the evidence would show that: on May 7, 2005, Pye reported to police that his vehicle with expensive wheel rims had been stolen from a parking lot; three days later, the vehicle was recovered without the rims; on June 23, 2005, Pye told police that

---

[1] Latilia Shaniece Hicks and Leo Sanders were also charged in the indictment with multiple crimes.

[2] OCGA § 5-7-1 reads:

(a) An appeal may be taken by and on behalf of the State of Georgia from the superior courts, state courts, City Court of Atlanta, and juvenile courts and such other courts from which a direct appeal is authorized to the Court of Appeals of Georgia and the Supreme Court of Georgia in criminal cases and adjudication of delinquency cases in the following instances:

(1) From an order, decision, or judgment setting aside or dismissing any indictment, accusation, or petition alleging that a child has committed a delinquent act or any count thereof;

(2) From an order, decision, or judgment arresting judgment of conviction or adjudication of delinquency upon legal grounds;

(3) From an order, decision, or judgment sustaining a plea or motion in bar, when the defendant has not been put in jeopardy;

(4) From an order, decision, or judgment suppressing or excluding evidence illegally seized or excluding the results of any test for alcohol or drugs in the case of motions made and ruled upon prior to the impaneling of a jury or the defendant being put in jeopardy, whichever occurs first;

(5) From an order, decision, or judgment of a court where the court does not have jurisdiction or the order is otherwise void under the Constitution or laws of this state;

(6) From an order, decision, or judgment of a superior court transferring a case to the juvenile court pursuant to subparagraph (b)(2)(B) of Code Section 15-11-28;

(7) From an order, decision, or judgment of a superior court granting a motion for new trial or an extraordinary motion for new trial;

(8) From an order, decision, or judgment denying a motion by the state to recuse or disqualify a judge made and ruled upon prior to the defendant being put in jeopardy; or

(9) From an order, decision, or judgment issued pursuant to subsection (c) of Code Section 17-10-6.2.

(b) In any instance in which any appeal is taken by and on behalf of the State of Georgia in a criminal case, the defendant shall have the right to cross appeal. Such cross appeal shall be subject to the same rules of practice and procedure as provided for in civil cases under Code Section 5-6-38.

his stolen rims were seen on a certain vehicle; four days later, Freeman was fatally shot as he exited his Ford Expedition sport utility vehicle, on which were the stolen rims; Pye, Chambers, and co-indictee Leo Sanders drove the vehicle and another car to a location where they could remove the wheel rims; they were interrupted by a cruising police car before they could complete the task; and Pye and Chambers left the scene.[3]

On September 29, 2005, at the request of police detectives, Pye went to a police station to examine the wheel rims taken from Freeman's vehicle. He was taken to an interview room and, in a videotaped interrogation, told the detectives about the theft of his vehicle, and that on the night of June 27, 2005, he saw the wheel rims on a Ford Expedition, a fact which he told a police officer on June 27, 2005; Pye also told the detectives that after leaving the skating rink on that same night, he went to a night club, and then home. After Pye identified one of the wheel rims as his, a detective asked: "You think it was worth killing somebody to get your rims back, Darrien?" Pye denied killing anyone, but after further questioning, stated that after leaving the skating rink, he, Chambers, and Sanders resolved to retrieve his rims from Freeman's vehicle by "carjacking" Freeman and then removing the rims. Pye stated that he had no plan other than to retrieve his wheel rims, while Chambers and Sanders wished to rob Freeman of money. The three had learned Freeman's identity and went to his house. When Freeman arrived, they exited Sanders's car; Chambers was armed with a shotgun or rifle, and Sanders with a pistol; Pye stated that he was unarmed, and "waited" while the two confronted Freeman; Pye heard a shot; and Pye drove away in Freeman's vehicle while the other two men drove in Sanders's car.

After recounting the above, Pye was advised of his *Miranda*[4] rights, signed a waiver of rights form, and gave police another statement recounting essentially what he just told them. This statement was transcribed and Pye signed it.

On October 3, 2005, police detectives arrived at the store where Chambers worked as a security guard; he was immediately placed in handcuffs, questioned at the store, and taken to a police station for further questioning. There, during a videotaped interrogation, police informed him that they were investigating a murder, and asked about his whereabouts on June 27, 2005; he related that he and Pye had gone to a skating rink, then to a night club, and that he had returned home about 4:30 a.m. The detectives then confronted Chambers with Pye's statement, in which Pye stated that Chambers was holding a

---

[3] It appears that Freeman's vehicle was eventually impounded.

[4] *Miranda v. Arizona,* 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

firearm immediately following the shooting. After further questioning, Chambers stated that he would tell them the truth, and related that Pye had telephoned him, and reminded him that Pye's wheel rims had been stolen. A detective then told him not to say anything further, and read him his *Miranda* rights. Chambers signed a waiver of rights form and stated that he agreed to help Pye retrieve his wheel rims from Freeman, but stated that it was Pye who fatally shot the victim.

The trial court conducted a hearing on Pye's and Chambers's motions to suppress; argument centered on the opinion of the United States Supreme Court in *Missouri v. Seibert*, 542 U. S. 600 (124 SC 2601, 159 LE2d 643) (2004). At the end of this hearing, the trial court postponed its decision on the motions. At a later hearing, the trial court declared it would suppress all of Pye's and Chambers's statements. In announcing its decision from the bench, the court declared that "the facts of this case are absolutely on point in the case of *Missouri v. Seibert*," and that "I have watched the [videotapes of the interrogations] over and over and I don't think from a constitutional perspective that we can condone the conduct of the police in the tapes."

The Supreme Court's decision in *Seibert* deals with what the Court referred to as a "two stage" or "question first" interrogation procedure, supra at 609-611, in which police first question a suspect without administering *Miranda* warnings, gain a statement from the suspect, then administer *Miranda* warnings, and have the suspect repeat that which the suspect has already related, often with little interruption in time.[5] The Court noted that in such circumstances, it is unlikely that the *Miranda* warnings will effectively advise a suspect of his rights. Id. at 611-614. The Court discussed its prior opinion in *Oregon v. Elstad*, 470 U. S. 298, 307 (105 SC 1285, 84 LE2d 222) (1985). *Elstad* allowed admission of a statement that followed *Miranda* warnings that had not been given the suspect until after a statement was made in violation of *Miranda*, provided that, under all the circumstances, the subsequent statement was determined to be knowingly and voluntarily made. The *Seibert* opinion distinguished *Elstad*, and essentially established an "effective warning" test, requiring an examination of circumstances to determine if the *Miranda* warnings given were effective; the opinion found that the warnings given to Seibert were ineffective to advise her of her rights, and thus

---

[5] The opinion states that "a national police training organization and other [police] departments" advocated using the technique to gain an admissible confession subsequent to the *Miranda* warnings.

her postwarning statements had to be suppressed. Id. at 617. Although the Court observed that the interrogation strategy employed in *Seibert* was deliberate, and even was admitted to be so by the police, the Court specifically noted that a police policy "will rarely be as candidly admitted as it was here," and declared that "the focus is on facts apart from intent that show the question-first tactic at work." Id. at 616, n. 6. As the Court found that the warning given could not effectively advise Seibert of her right to remain silent, her postwarning statements were inadmissible.[6]

In applying that analysis, "the trial court's findings as to disputed facts will be upheld unless clearly erroneous and the trial court's application of the law to undisputed facts is subject to de novo review." *State v. Nash*, 279 Ga. 646, 648 (2) (619 SE2d 684) (2005).

### Case No. S07A0689

Pye's interrogation can be divided into three temporal segments: the time before the detective asked if it was worth killing someone over the wheel rims; the interval thereafter until *Miranda* warnings were given; and the period after *Miranda* warnings were given. *Miranda*, and by extension *Seibert*, apply only to custodial interrogation. See *Wiggins v. State*, 280 Ga. 627, 629 (2) (a) (632 SE2d 80) (2006). An interrogating detective testified that at the point that he first asked Pye about the homicide, Pye was not free to leave. At the hearing, the State conceded that from this point until *Miranda* warnings were given, Pye's recounting of events was not admissible, and on appeal, the State argues only that Pye's oral declarations which occurred prior to this point (i.e., the first period of time), and his

---

[6] The State argues that it is not the *Seibert* plurality opinion that governs, but the concurrence of Justice Kennedy, who would continue to apply *Elstad* unless a "deliberate two-step strategy" was employed, id. at 622 (Kennedy, J., concurring), and contends that the trial court here did not find that the police deliberately avoided *Miranda*. The State considers Justice Kennedy's view to be "the narrowest ground," and cites *Marks v. United States*, 430 U. S. 188, 193 (97 SC 990, 51 LE2d 260) (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .' [Cit.]"). However, "[i]t does not seem 'useful to pursue the *Marks* inquiry to the utmost logical possibility when it has so obviously baffled and divided the lower courts that have considered it.' [Cit.]" *Grutter v. Bollinger*, 539 U. S. 306, 325 (123 SC 2325, 156 LE2d 304) (2003). And here it would not be useful to go to this "utmost logical possibility"; a requirement that there be found a subjective intent on the part of police was not only rejected by the plurality of *Seibert*, but also by the four Justices who comprised the dissent, which was particularly critical of deciding *Miranda* issues based upon a police officer's subjective intent. *Seibert*, supra at 624-627 (O'Connor, J., dissenting). Accordingly, we will not consider *Seibert* to hold that a finding of subjective intent is required, and will consider the analysis presented in the plurality opinion to be that mandated by the United States Supreme Court.

oral and written declarations after *Miranda* warnings were administered (i.e., the third period of time), are admissible.

The only evidence presented as to the first period of time was that Pye voluntarily went to the police station to discuss the theft of his wheel rims, and that is all that was discussed initially. Shortly after Pye was confronted about killing Freeman, he was told to stand up, his bag was searched, and his person was patted down. We agree that a reasonable person in Pye's position would not believe that he was free to leave once the detectives began questioning him about the murder, and that he was in custody at that point. See *Hardin v. State*, 269 Ga. 1, 3 (2) (494 SE2d 647) (1998). However, the trial court suppressed Pye's oral and written statements from all three time periods. It was error to exclude evidence of that which Pye said during the first period, prior to the detective's confronting him about killing Freeman. At that time, Pye was not in custody, and there could thus be no violation of *Miranda*. See *Cook v. State*, 274 Ga. 891, 895 (3) (561 SE2d 407) (2002).

As to Pye's admissions during the third period of time,[7] this case presents the situation that caused the United States Supreme Court concern in *Seibert*. Pye was questioned without being warned of his right to remain silent, he gave a statement implicating himself in the crimes, and then, without any break in the proceedings, was given *Miranda* warnings, asked some questions regarding his right to counsel, executed a waiver of his rights, and gave a statement that was essentially identical to the version of events he had already revealed to the detectives. In fact, just before executing the waiver form, Pye asked, "say for instance, if I don't talk right now, I'm a be going to jail?"[8] This question shows that Pye was clearly aware that he had given the police incriminating information, and that he expected it to be used against him. As *Seibert* noted,

> when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and "depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." [Cit.] By the same token, it would ordinarily be unrealistic to treat two spates of

---

[7] As noted, the State is not advocating that evidence concerning Pye's admissions during the second period of time is admissible, and we agree it is not.

[8] A detective answered: "One of the two, yes."

integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle.

Supra at 613-614. As in *Seibert*, at this point "there was little, if anything, of incriminating potential left unsaid." Id. at 616. Prior to giving *Miranda* warnings, the detectives elicited Pye's agreement to give them a typewritten statement. There was nothing in the circumstances which allowed Pye to view the portion of the interrogation after *Miranda* warnings "as presenting a markedly different experience from" that portion of the interrogation before he was warned; the delayed *Miranda* warnings cannot be considered to have been effective under *Seibert*, and the trial court did not err in suppressing Pye's oral and written statements made after the detectives administered *Miranda* warnings.

### Case No. S07A0894

The State first contends that Chambers was not in custody prior to his *Miranda* warnings being given to him. While the trial court did not make an explicit finding that Chambers was in custody, the court's statement that *Seibert* was "on point" in this case shows that the court implicitly found that Chambers was in custody. And, there was evidence to support that finding. There was testimony that: the first thing police officers did when approaching Chambers at the store where he was employed was to handcuff him; they took him to a private room in the store; security cameras showed that he remained in handcuffs in that room; he was walked out of the store between police officers, still handcuffed; he was driven to the police station in handcuffs; and he was questioned by two officers in an interrogation room with the door closed, although he was not in handcuffs during the questioning.[9] We agree with the trial court that Chambers was in custody for purposes of requiring *Miranda* warnings. See *Hardin*, supra.

Voluntary statements made by unwarned suspects in custodial interrogation are presumed to be compulsory and are inadmissible at trial. See *Oregon v. Elstad*, 470 U. S. 298,

---

[9] When discussing the matter during the hearing, prior to watching the videotapes of the questioning, the trial court opined that these facts made Chambers's assertion of being in custody stronger than that of Pye.

307 (105 SC 1285, 84 LE2d 222) (1985) ("Failure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary . . . must nevertheless be excluded from evidence under *Miranda*."); *Livingston v. State*, 264 Ga. 402 (6) (444 SE2d 748) (1994).

*Waters v. State*, 281 Ga. 119, 121 (4) (636 SE2d 538) (2006). Accordingly, even if Chambers's prewarning declarations are viewed as voluntary, they were properly excluded.

As to Chambers's postwarning statements, again, there was little in the interrogation after the *Miranda* warnings "presenting a markedly different experience from" that portion of the interrogation before Chambers received any warnings. *Seibert*, supra at 616. Prior to the warnings, the detectives were questioning him about Freeman's murder, advised him that Pye was in jail for murder, cautioned him that he needed to tell the truth, told him that he was going to be "behind" Pye in being jailed, accused him of killing Freeman, told him that they were not "playing," and told him that Pye placed him at the scene with a weapon. After the warnings, the content of the interrogation remained the same. Again, there was no temporal break in questioning between the prewarning interrogation and the detectives advising Chambers of his rights,[10] and nothing disturbed the "coordinated and continuing" nature of the interrogation. *Seibert*, supra at 613. Under the circumstances, the warnings cannot be considered to be effective under *Seibert*, and the trial court did not err in granting Chambers's motion to suppress.[11]

*Judgment affirmed in part and reversed in part in Case No. S07A0689. Judgment affirmed in Case No. S07A0894. All the Justices concur.*

DECIDED OCTOBER 29, 2007 —
RECONSIDERATION DENIED DECEMBER 14, 2007.

*Paul L. Howard, Jr., District Attorney, Marc A. Mallon, Bettieanne C. Hart, Assistant District Attorneys*, for appellant.
*Albert A. Mitchell*, for appellee (case no. S07A0689).

---

[10] One detective told Chambers not to say anything while he completed a waiver form with Chambers's name, the date, etc.; this lasted less than one minute.

[11] Chambers's brief includes a purported enumeration of error and is denominated "Response Brief and Cross-Appeal of Appellee." However, no cross-appeal is docketed in this Court, and no notice of cross-appeal has been filed. See OCGA §§ 5-6-38 and 5-7-1 (b). Therefore, the purported enumeration of error is not considered.

*Tamara E. Theiss*, for appellee (case no. S07A0894).