A11A0661. THE STATE v. KENDRICK.
(711 SE2d 420)

PHIPPS, Presiding Judge.

Charged with the burglary of a dwelling house of another with the intent to commit a theft therein, Michael Kendrick moved to exclude statements he made to a police patrol officer and to a police investigator. The trial court conducted a hearing, after which it granted Kendrick's motion. In this appeal, the state contests the exclusion of the statement to the police investigator, but has demonstrated no reversible error. We affirm.

The evidence, which was presented at the hearing through the testimony of the patrol officer and the investigator, showed the following. On June 11, 2010, the patrol officer's suspicion was aroused when he observed a man, holding a ceiling fan, approach and say something to one, and then another, individual in a parking lot. The officer drove his unmarked patrol car into the parking lot to determine what the man was doing with the fan. As the officer drove close to him, the man flagged down the officer and volunteered that he had not stolen the fan, that he had gotten it from his house, and that he merely was trying to sell it. The officer, who was wearing a black police raid vest that displayed both a city police patch and the word "POLICE" in yellow letters, got out of his car, stood within an arm's length of the man, and asked him to explain again why he had the fan. The man answered that he was simply trying to make some money. The officer told the man that he did not believe his claim that he had gotten the fan from his house and then asked the man for identification. The man told the officer his name. The officer

recounted that the man stated that he had no identifying documentation with him, "So I detained him." And the officer so informed the man that he was going to detain him for further investigation. At the hearing, the officer identified the man as Kendrick, testifying further that, at that point in their encounter, "[Kendrick] was not free to leave" because he still had not determined where Kendrick had gotten the fan.

Therefore, the officer continued his investigation, telling Kendrick several times that he needed to be honest and show him exactly where he had gotten the fan. Kendrick eventually said that he would, and the officer handcuffed him and put him in the back seat of his patrol car. Kendrick directed the officer to a pile of trash located a short distance down the street. Once there, the officer testified, Kendrick repeatedly told the officer that he had taken the fan from the pile of trash; each time, the officer told Kendrick that he did not believe him and told him to be honest with him. Kendrick eventually told the officer that he had taken the fan out of the abandoned house that was near the pile of trash, adding that a door to the house was already open.

The patrol officer called for a backup officer. When the backup officer arrived, he monitored Kendrick, while the patrol officer got out of his vehicle and peered into the house. He saw in one of the rooms wires hanging from the ceiling that indicated to him that a ceiling fan had been removed. The patrol officer conceded at the hearing that he never read Kendrick the *Miranda* rights. The patrol officer was thus asked, "Why not?" He answered, "I was going to take him to the precinct and let the investigator do his thing."

Kendrick was transported by the backup officer in his marked police vehicle to the precinct. Still in handcuffs when he arrived there, Kendrick was taken to a room where he was joined by the patrol officer. The patrol officer summoned the investigator, who was already at the precinct. The investigator testified that, when he walked into the room, "[the patrol officer] briefed me of why he stopped Mr. Kendrick. And then I read Mr. Kendrick the *Miranda* warnings prior to even talking to him." Kendrick stated that he would talk to the investigator without an attorney. The investigator asked Kendrick why he had been arrested, and Kendrick answered to the investigator that he had entered a house and taken a ceiling fan, adding that a door to the house was already open.[1] Upon the investigator's further questioning, Kendrick responded that he did not know of any other crimes and had not been involved in any other

---

[1] The interview was not recorded, and Kendrick was not presented any *Miranda* waiver form to sign.

crimes, and the investigator ended the interview. The handcuffs had remained on Kendrick throughout the interview.

At the hearing on the motion to suppress, Kendrick's lawyer argued that the statements made to the patrol officer after Kendrick was handcuffed were inadmissible under *Miranda v. Arizona*.[2] His lawyer also argued that the statements he made to the investigator, albeit after the reading of the *Miranda* rights, were inadmissible under *Missouri v. Seibert*[3] and *State v. Pye*.[4]

1. As an initial matter, we note that the state made no argument to the trial court that Kendrick's statements to the patrol officer after Kendrick was handcuffed are admissible. The trial court excluded Kendrick's statements to the patrol officer after he was handcuffed, expressly finding that by that point, he was in custody and had not been read the *Miranda* rights. The state does not contest on appeal any aspect of the trial court's ruling in that regard. Nevertheless, we conclude that the record supports the trial court's ruling that the statements are inadmissible,[5] based on its finding that Kendrick made them in response to a custodial interrogation and without the benefit of the *Miranda* warnings,[6] as this conclusion is pertinent to the resolution of the state's sole contention that the exclusion of Kendrick's later statements to the investigator was reversible error.[7]

2. The state maintains that Kendrick's confession made to the investigator after the reading of the *Miranda* rights is admissible.

As Kendrick's lawyer argued to the trial court, this case presents the type of situation that caused the United States Supreme Court concern in *Seibert*, and later, caused the Supreme Court of Georgia concern in *Pye*. In *Seibert*, the officers arrested the suspect, subjected

---

[2] 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

[3] 542 U. S. 600 (124 SC 2601, 159 LE2d 643) (2004).

[4] 282 Ga. 796 (653 SE2d 450) (2007).

[5] See id. at 800-801, n. 7 (agreeing that certain statements were not admissible, even though state had not advocated that the statements were admissible).

[6] See id. at 802-803 (holding that unwarned responses to police questioning were properly excluded, where evidence supported trial court's implicit finding that defendant was in custody during the interrogation). See also *Jennings v. State*, 282 Ga. 679, 681 (3) (653 SE2d 17) (2007) (using officer's testimony on whether defendant was in police custody or "was free to leave" to determine whether suspect was in custody for *Miranda* purposes); *Quedens v. State*, 280 Ga. 355, 358 (2) (629 SE2d 197) (2006) (for *Miranda* purposes, an individual is in custody if a reasonable person in the place of the defendant would feel so restrained as to equate to a formal arrest); *State v. Wintker*, 223 Ga. App. 65, 68-69 (476 SE2d 835) (1996) (holding that defendant was in custody for *Miranda* purposes when she was involuntarily confined in locked patrol car because, although not occurring in a police station, the defendant's interrogation while so confined was equally isolated and police-dominated).

[7] See Division 2, infra. Cf., e.g., *Timmreck v. State*, 285 Ga. 39, 41 (2) (673 SE2d 198) (2009) (not reaching whether post-*Miranda* statements were admissible under *Pye*, where statements prior to *Miranda* were not made while defendant was in custody).

her to custodial questioning without *Miranda* warnings, and obtained a confession.[8] Then, after giving the arrestee a 20-minute coffee and cigarette break, police obtained from her a signed waiver of *Miranda* rights, and she gave a second confession.[9] That second confession was inadmissible, *Seibert* held, because the "midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with *Miranda*'s constitutional requirement."[10] Incriminating statements made under similar circumstances by co-defendants in *Pye* were also ruled inadmissible.[11]

As the Supreme Court of Georgia explained in *Pye*,

> [t]he [United States] Supreme Court's decision in *Seibert* deals with what the Court referred to as a "two stage" or "question first" interrogation procedure, in which police first question a suspect without administering *Miranda* warnings, gain a statement from the suspect, then administer *Miranda* warnings, and have the suspect repeat that which the suspect has already related, often with little interruption in time. The Court noted that in such circumstances, it is unlikely that the *Miranda* warnings will effectively advise a suspect of his rights.[12]

This is because, as *Seibert* explained,

> [u]pon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again. A more likely reaction on a suspect's part would be perplexity about the reason for discussing rights at that point, bewilderment being an unpromising frame of mind for knowledgeable decision. What is worse, telling a suspect that "anything you say can and will be used against you," without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail.[13]

---

[8] *Seibert*, supra at 604-605 (I); see *Wiggins v. State*, 280 Ga. 627, 629 (2) (a) (632 SE2d 80) (2006) (summarizing *Seibert*).

[9] *Seibert*, supra at 605 (I).

[10] Id. at 604.

[11] See *Pye*, supra at 802-803.

[12] Id. at 799 (footnote omitted), citing *Seibert*, supra at 609-614.

[13] *Seibert*, supra at 613 (IV) (footnote omitted).

Thus, *Seibert* established an "effective warning" test.[14] That is, when interrogators question first and warn later, the threshold issue is "whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires."[15] In reviewing a trial court's analysis thereof, we uphold factual findings unless they are clearly erroneous and review the legal conclusions de novo.[16]

The record in this case shows that the patrol officer detained Kendrick after being told that he had no identification documents and thus informed Kendrick of his detention for further investigation; soon, the officer handcuffed Kendrick and put him in the back seat of his patrol car; in response to custodial interrogation, and without the benefits of *Miranda* warnings,[17] Kendrick gave a statement implicating himself in the crime of burglary; the patrol officer had withheld the *Miranda* warnings because he was "going to take [Kendrick] to the precinct and let the investigator do his thing"; after Kendrick was transported to the police precinct and the investigator read him the *Miranda* warnings, then asked him why he had been arrested, Kendrick gave a statement to the investigator that was essentially identical to what he had already said to the patrol officer. This "two stage" interrogation technique employed upon Kendrick is not materially distinguishable from those employed in *Seibert* and *Pye*.[18] Both those cases noted that where

> *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and deprive a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them. By the same token, it would ordinarily be unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations sub-

---

[14] *Pye*, supra at 799.

[15] *Seibert*, supra at 611-612 (IV) (also contrasting that *Miranda*, supra, addressed interrogation practices likely to disable an individual from making a free and rational choice about speaking and thus held that a suspect must be adequately and effectively advised of the choice the Constitution guarantees, whereas the object of question-first tactic is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them: after the suspect has already confessed).

[16] *Pye*, supra.

[17] See Division 1, supra.

[18] See *Pye*, supra at 800 and n. 6 (finding no requirement of any subjective intent by the police, because while the *Seibert* Court observed that the interrogation strategy employed there was admittedly deliberate, the *Seibert* Court specifically noted that a police policy "will rarely be as candidly admitted as it was here" and therefore declared that "the focus is on facts apart from intent that show the question-first tactic at work").

ject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle.[19]

Nevertheless, the state maintains that Kendrick's confession repeated after the investigator read the *Miranda* warnings is admissible under *Oregon v. Elstad*.[20] The facts underlying *Elstad* are detailed in that opinion and further analyzed in *Seibert*;[21] thus, they need not be repeated here. Suffice it to say that *Elstad* does not control this case for two reasons. First, the circumstances under which the *Elstad* defendant made his initial and unwarned incriminating statements had "none of the earmarks of coercion,"[22] unlike here,[23] and unlike in *Seibert* as that case so distinguished.[24]

Second, the *Seibert* Court announced a series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object:

> the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.[25]

Examination of those facts leads to the conclusion that the *Miranda* warnings in the instant case were not effective.[26]

The patrol officer's questioning of Kendrick was persistent and exhaustive. Indeed, when he finished, as were the situations in *Seibert* and in *Pye*, "there was little, if anything, of incriminating potential left unsaid."[27] The backup police officer who was summoned to the scene stayed with Kendrick while the patrol officer more closely inspected the abandoned house, then the backup officer transported Kendrick in his marked police car to the police precinct.

---

[19] *Seibert*, supra at 613-614 (IV) (citation and punctuation omitted); *Pye*, supra at 801-802 (citation omitted); see *Wiggins*, supra.

[20] 470 U. S. 298 (105 SC 1285, 84 LE2d 222) (1985).

[21] *Seibert*, supra at 614-615 (V).

[22] *Elstad*, supra at 316 (III) (citation omitted).

[23] See Division 1, supra.

[24] *Seibert*, supra at 614 (IV). Accord *Timmreck*, supra; *Grayer v. State*, 282 Ga. 224, 229 (3) (647 SE2d 264) (2007) (where, at the time appellant made his first statement, he was not under arrest and thus not subjected to custodial interrogation, his latter statement was not inadmissible under *Seibert*).

[25] *Seibert*, supra at 615 (V).

[26] See *Pye*, supra at 799-800 (instructing that *Seibert* requires an examination of certain circumstances to determine whether the *Miranda* warnings given were effective).

[27] *Seibert*, supra at 616 (V); *Pye*, supra at 802 (citation and punctuation omitted).

Arriving at the precinct still in handcuffs, Kendrick was taken to a room where he was joined by the patrol officer and then the investigator. The patrol officer summarized the events that precipitated Kendrick's arrest and transport to the precinct. In reciting to Kendrick the *Miranda* warnings, the investigator "said nothing to counter the probable misimpression that the advice that anything [Kendrick] said could be used against [him] also applied to the details of the inculpatory statement previously elicited"[28] by the patrol officer. "In particular, the police did not advise that [Kendrick's] prior statement could not be used."[29] Nothing was said or done to dispel the oddity of warning about legal rights to silence and counsel soon *after* the patrol officer had elicited a confession through persistent interrogation; and any uncertainty on Kendrick's part about a right to stop talking about matters previously discussed would only have been aggravated since the patrol officer remained in the interrogating room.[30] "There was nothing in the circumstances which allowed [Kendrick] to view the portion of the interrogation after *Miranda* warnings as presenting a markedly different experience from that portion of the interrogation before he was warned."[31]

> It would have been reasonable to regard the two [questioning] sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before. These circumstances must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in [Kendrick's] shoes would not have understood them to convey a message that [he] retained a choice about continuing to talk.[32]

In its order granting Kendrick's motion to suppress the statements, the trial court pertinently found that Kendrick's statements to the investigator were made "close in time and [were] wholly repetitive of statements made during the un-*Mirandized* custodial interrogation of [Kendrick] by [the patrol officer]." The trial court's factual findings are not clearly erroneous; and because the evidence showed further that "the midstream recitation of warnings after

---

[28] *Seibert*, supra.

[29] Id. (footnote omitted).

[30] See id. See generally *Franks v. State*, 268 Ga. 238, 241 (486 SE2d 594) (1997) (describing the "cruel trilemma" confronting arrested suspects during custodial interrogations); *Wells v. State*, 297 Ga. App. 153, 164 (3) (c) (676 SE2d 821) (2009) (same).

[31] *Pye*, supra (punctuation omitted).

[32] *Seibert*, supra at 616-617 (V) (footnote omitted).

interrogation and unwarned confession could not effectively comply with *Miranda* constitutional requirement," the trial court did not err in ruling that Kendrick's confession repeated after the warning is inadmissible.[33]

*Judgment affirmed. Andrews and McFadden, JJ., concur.*

DECIDED JUNE 13, 2011.

*Paul L. Howard, Jr., District Attorney, Lenny I. Krick, Christopher M. Quinn, Assistant District Attorneys*, for appellant.

*Lauren B. Shubow*, for appellee.

---

[33] See id. at 604; *Pye*, supra.