A11A1894. DAILEY v. THE STATE.
(723 SE2d 43)

PHIPPS, Presiding Judge.

In connection with a crime spree that culminated in a shoot-out with a law enforcement officer, Jay Matthew Dailey was tried by a jury, then convicted of various offenses against numerous victims. In

this appeal, Dailey challenges on *Miranda*[1] grounds the admission of his police statements; he also challenges the denial of certain jury charge requests. Pretermitting whether any *Miranda* violation occurred, we conclude that the trial transcript confirms that any error in the admission of the contested statements was harmless. The transcript confirms also that Dailey was not entitled to the cited jury charges. We affirm.

The crime spree occurred at lunchtime on February 1, 2008, along a well-traveled stretch of roadway. To prove its case that Dailey had committed the crimes, the state called at trial numerous victims, bystanders, and responding officers. They recounted the following.

An 11-year-old boy who was visiting his great-grandmother at her house testified that he noticed a car parked at a nearby church, particularly because no other cars were there. Abruptly, with tires squealing, the car sped away from the church and crashed into a fire hydrant across the street. The driver, a man, got out of the car and began walking down the street. He was wearing a bulletproof vest; he was talking to himself and "shaking his head"; his gait was "kind of strange, like he was drunk"; and he was carrying in his hand what appeared to be a gun. The man walked out of the boy's view. Soon thereafter, the boy heard screams and gunfire.

A woman who was traveling that roadway to pick up her preschool children testified that, around the time in question, she saw a car positioned as though it had crashed into a fire hydrant; the car was located in a grassy area. A man was standing behind the car, putting on or adjusting a bulletproof vest. After doing so, the man darted across the street, and the woman could no longer see him.

Leresa Graham testified that, around the time in question, she was driving her gold SUV to her place of employment in the area. A man ran toward her in her lane of travel, and he was putting on what appeared to be a bulletproof police vest. Graham slowed her vehicle, and the man approached her window, stated that he was a police officer, displayed a police badge, claimed that he was hurt, and asked her to dial 911. But when she grabbed her phone, the man slapped it out of her hand, then sprayed pepper spray on her face. Graham screamed and closed her window, clamping the man's arm. The man repeatedly screamed that he would kill her. Barely able to see, Graham continued to scream for help. The man began "checking the [back] door" of Graham's vehicle. He eventually smashed Graham's window with an object she was unable to identify, threw the pepper spray cannister at her, then walked away. Because of the pepper spray effects, Graham could not ascertain the man's whereabouts,

---

[1] See generally *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

and she continued to scream for help about a man trying to kill her. Soon thereafter, Graham recalled, a man, and later, a police officer came to her aid. At trial, Graham described her injuries, and she identified Dailey as the man who had accosted her, injured her with pepper spray, and threatened to kill her.

Chuck Sheldt testified that, at about 11:00 a.m. or noon that day, he was driving along his usual route to his job. As he approached a gold SUV stopped in his travel lane, he saw a man standing outside the SUV beating on the driver's side window with "something in his hand." The man was wearing a bulletproof vest. Although Sheldt drove around the commotion, he circled back to the SUV to render aid. By then, the driver's window of the SUV had been shattered, and the woman inside the vehicle was screaming "at the top of her lungs." Sheldt stopped his truck at the SUV to talk to the man, who was about eight feet away. But the man, using both hands, raised a gun, then aimed it at Sheldt. Instantly, Sheldt ducked and "hit the gas pedal," running his truck into a ditch before fleeing the scene. Sheldt dialed 911 and reported the gunman. At trial, Sheldt identified Dailey as the gunman.

Barry Smith's wife worked in the area. As he was taking lunch to her that day, he came upon a car positioned at a fire hydrant such that it appeared to have "taken a quick dart off the road." Smith noted a man nearby who was staggering, "almost falling into the road"; Smith noted also that the man was wearing a vest. After dropping off his wife's lunch about a mile away, he traveled back along the same route. This time, he saw a gold SUV stopped in his lane of traffic, and a truck (and another vehicle) that had "pulled off across from" the stopped SUV. As Smith was slowly maneuvering around the vehicles, he encountered the man, who looked directly at him, raised in clasped hands what Smith discerned was a gun, then aimed the weapon at him. There was no one else near Smith, and he characterized the gunman's action as "deliberate" and targeted at him. Smith drove away from the area, saw a patrol car within a mile, flagged it down, and reported to the officer inside that a man wearing a vest had just pointed a gun at him. At trial, Smith identified Dailey as the gunman.

Paul Phillips was the officer flagged down by Smith. He testified that he was driving home from an extra job directing traffic in the area at about noon on the date in question. He was wearing a police jacket and duty pants when he stopped his marked patrol vehicle at the behest of a motorist waving insistently. Upon hearing the motorist's report about a gunman, Phillips activated his patrol car's blue lights and drove to the reported scene about a quarter-mile away. The officer saw an SUV stopped in the roadway, and alongside it on the ground, broken glass. He stopped near the SUV, then exited

his patrol car. Screams were coming from the SUV, which was undulating from weight shifting. About this time, a man wearing police gear — a bulletproof vest and a duty belt — brandished a firearm, then "made a tactical maneuver around the corner of the back of the [SUV]" to face Phillips. Determining, thus, that the gunman was an officer, Phillips signaled to him that he was a law enforcement officer there to help. But the gunman aimed his gun at Phillips, who then commanded: "Police, drop the gun!" The man instead opened fire, severely wounding Phillips. Returning gunfire, Phillips retreated to his patrol car; shots continued to be fired at him, shattering the patrol car's windshield. The barrage ceased, however, and Phillips observed that the man's hand was bleeding and that the man nevertheless was attempting to "function" his weapon. Thereupon, Phillips ordered the gunman to drop his weapon, walk toward him, then lie on the ground. This time, the shooter complied with Phillips's command. At about five feet from the patrol car, the shooter blurted: "I'm a cop. I'm a drunk cop, but I'm a cop." Phillips issued an "officer down" summons for assistance. Because of Phillips's severe wound, a motorist who meanwhile had stopped at the scene helped to restrain the shooter on the ground, while Phillips was "covering the defendant with [his] firearm to assure that he did not injure the public any further." At trial, Phillips identified Dailey as the shooter.

The first officer to respond to Phillips's summons arrived to find a woman screaming in a gold SUV, stopped in a lane of traffic; a man lying on the ground, bleeding from a wounded hand; and an officer sitting in a patrol car, bleeding profusely from a wounded arm. Lying on the ground near the SUV were a bulletproof vest and a handgun. Based on information provided by Phillips, the woman in the gold SUV, and the man restraining the man with the wounded hand, the responding officer handcuffed the man lying on the ground. When the responding officer asked Phillips whether that man was the only perpetrator, Phillips responded yes. Also, the man himself volunteered, "I'm the perp . . . I'm the only perp." The man added that he had "messed up" and recommended that the responding officer "just shoot him in the head." The responding officer found on the perpetrator's person two loaded firearms, ammunition clips, and a pocket knife. At trial, the responding officer identified Dailey as the man who had been lying on the ground with weaponry stashed on his person and who identified himself as the sole perpetrator of the crimes committed.

The second officer to respond to Phillips's summons arrived to find a man lying on the ground in handcuffs and an officer attending to Phillips's visible injury. This officer testified about a fourth handgun found in a nearby grassy area. He testified also that the

handcuffed man said more than once that he was the only "perp on scene" and that he wanted the officers to kill him. At trial, this second responding officer identified Dailey as the man who claimed to have solely perpetrated crimes at the scene.

The third officer who responded testified that he arrived to find a bleeding, handcuffed man lying on the ground; a bleeding Phillips sitting in his patrol car with bullet holes through the driver's side of the windshield; a hysterical woman in a gold SUV; and a bulletproof vest lying on the ground. This third responding officer inspected the vest and found a bullet lodged in it. About this time, emergency medical personnel arrived and began to treat the wounded men. This responding officer accompanied the perpetrator during his ambulance transport to the hospital's emergency room to make sure that the man did not leave and did not hurt anyone else. At trial, this responding officer identified Dailey as the handcuffed man whom he had accompanied in an ambulance to a hospital.

The third responding officer gave additional testimony concerning Dailey. Throughout his transport to the hospital, and without any question or comment posed to him by the officer, Dailey ranted: he worked for a police department; the department should not have hired him; and if the accompanying officer did not shoot him, he would take the officer's gun. The accompanying officer testified that he responded to Dailey only when Dailey threatened to take his weapon — instructing Dailey that he would not do so.

Additionally, the state presented testimony of other witnesses who gave accounts similar to those set forth above. For example, a resident noticed a gold SUV stopped in the roadway in front of her home; a man was reaching through, then later beating on one of its windows. The resident also heard yelling from the area of the SUV, and she observed the man walking around the SUV. When a marked patrol car approached, the resident discerned that the man had a gun in his hand. And when the patrol car stopped on one side of the SUV, she saw the man walk to the opposite side of the SUV. The resident also witnessed a uniformed officer exit the patrol car, and the man immediately raise his gun over the SUV and shoot at the officer. She, too, called 911.

Another state's witness was the motorist who stopped at the scene and was later able to render assistance to the wounded Phillips in restraining Dailey. He testified that, traveling that road to work, he came upon a stopped SUV; a woman was hanging out of its window, waving her hands, frantically asking for help. He stopped. The woman's face was red and her eyes were watering; also, a window had been broken out of the SUV. Within moments, the motorist recalled, a man wearing a bulletproof vest and carrying a gun began walking toward them. And about that time, the motorist

recalled, Phillips arrived in a marked patrol car and yelled for the man wearing the vest to put down his weapon. A gunfight ensued, until ultimately the man dropped his weapon and lay on the ground. At some point, the motorist recalled at trial, the man had taken off his vest. The man apologized and said that he had been "drinking." Phillips revealed that he had been shot. Additional officers arrived about three minutes later. At trial, this motorist who stopped to render aid to the frantic woman identified Dailey as the gunman who had worn the vest and who had engaged Phillips in a gunfight.

The state also called a city solicitor who testified that, on the day in question, Dailey was a police officer and had appeared as an officer in a court proceeding earlier that day. Dailey elected not to testify. He was convicted of the following offenses. Regarding Phillips, the officer shot at the scene, Dailey was convicted of aggravated assault upon a peace officer and possession of a firearm during commission of a felony. Regarding Graham, the woman who was verbally and physically attacked in her SUV, Dailey was convicted of simple assault, issuing a terroristic threat, and battery. Regarding Sheldt, the motorist who drove his truck through a ditch after being threatened at gunpoint, Dailey was convicted of aggravated assault and possession of a firearm during commission of a felony. Regarding Smith, the other motorist who flagged down Phillips after being threatened at gunpoint, Dailey was convicted of aggravated assault and possession of a firearm or knife during commission of a felony.

1. Dailey contends that the trial court erred by admitting in evidence statements he made to police at the hospital because they were made without the benefit of *Miranda* warnings.

At about 1:45 p.m. on February 1, 2008, two police detectives arrived at the hospital to investigate reported shootings of two police officers. They found several officers stationed outside Dailey's room, where Dailey was being treated by medical professionals.

The detectives spoke with Dailey three times about the incident. Their first interview, which was without any *Miranda* warnings, was cut short because Dailey became combative with medical staff and had to be restrained for treatment. During their second interview about two hours later, Dailey was advised at some point of his *Miranda* rights; he continued to answer the police inquiries. And at the start of their third interview, Dailey was given *Miranda* warnings. Audio recordings of these three police interviews were played for the jury.

On appeal, Dailey challenges the admission of statements he made during only the first and second police interviews.[2] During the

---

[2] Dailey acknowledges that he gave a third interview, after he was again given *Miranda*

first interview, Dailey stated that he was a police officer; that he had appeared in court earlier that morning; that he never should have been a cop; that after leaving work, he had consumed alcoholic beverage; that he was "drunk"; that he apparently wanted to die — "death by cop"; that he had been wearing a bulletproof vest; and that he had no memory of why he had stopped his vehicle, where he was headed before he stopped it, why he would have engaged in a gunfight with a police officer, or anything else at the scene.

During the second interview, Dailey made many of the same statements. He stated also that he could recall being in a car wreck on the side of a road; that he had a vague recollection of shooting his gun at the scene, but did not know why he would have been shooting; that he recalled a woman screaming, but could not remember what she was saying; and that he recalled either himself or another man yelling, "I'm a cop; I'm hit!"

Challenging the admissibility of the evidence, Dailey contends that the trial court erred by determining that he was not in custody during the first and second interviews.[3] Dailey maintains that, given the circumstances surrounding the detectives' inquiries, a reasonable person in his situation would have perceived that he was in custody.[4]

> *Miranda* warnings must be administered to an accused when the accused is in custody and subjected to interrogation or its functional equivalent, i.e., any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. Voluntary statements made by unwarned sus-

---

warnings. During that interview, Dailey essentially repeated statements made during earlier police interviews. Because Dailey states on appeal, "This third statement is not challenged," we do not consider the propriety of the admission of evidence thereof. Cf. *State v. Kendrick*, 309 Ga. App. 870, 872-877 (2) (711 SE2d 420) (2011) (considering merits of appellant's contention that the statements he made to an investigator, albeit after the reading of the *Miranda* rights, were inadmissible under *Missouri v. Seibert*, 542 U. S. 600 (124 SC 2601, 159 LE2d 643) (2004), and *State v. Pye*, 282 Ga. 796 (653 SE2d 450) (2007)).

[3] See *Stansbury v. California*, 511 U. S. 318, 323 (II) (114 SC 1526, 128 LE2d 293) (1994) ("In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.") (citation and punctuation omitted).

[4] See generally *Robinson v. State*, 278 Ga. 299, 301 (2) (602 SE2d 574) (2004) (unless a reasonable person in suspect's situation would perceive that he was in custody, *Miranda* warnings are not necessary); *Mayberry v. State*, 267 Ga. App. 620, 622-623 (600 SE2d 703) (2004) (in resolving question of "custody," relevant inquiry is whether a reasonable person in suspect's position would have understood the situation to constitute restraint on freedom of movement of the degree which the law associates with formal arrest).

pects in custodial interrogation are presumed to be compulsory and are inadmissible at trial.[5]

Notwithstanding, to be successful, a claim of error requires a showing of both harm and error.[6] Here, even assuming that the trial court erred by admitting the challenged police statements (as not tainted by a *Miranda* violation), the error was harmless in light of the fact that the cited police statements were cumulative of other unchallenged confessions by Dailey. Dailey repeatedly identified himself at the scene as the sole perpetrator. And his on-the-scene confessions, as well as remarks he made to a police officer en route to the hospital, were "spontaneous and unsolicited statement[s] not made in response to any form of custodial interrogation" and therefore were "not subject to the strictures of *Miranda* and [were] admissible without the warnings having been given."[7] Moreover, as Dailey concedes on appeal, "At the scene . . . Officer Phillips, bystanders and appellant told officers that appellant was the only perpetrator." And as detailed above, numerous victims and eyewitnesses identified Dailey — both at the scene and at trial — as the sole perpetrator of the crimes for which he was convicted. In addition, at the scene, handguns and other weaponry were seized from Dailey's person; a bulletproof vest, with a bullet lodged therein, was found near the SUV; and a gun was discovered in a grassy area nearby. In light of these circumstances, Dailey has demonstrated no harm.[8] "Since appellant has not demonstrated any harm suffered by him as a result of the trial court's denial of his motion to suppress, he has

---

[5] *Phillips v. State*, 285 Ga. 213, 215 (2) (675 SE2d 1) (2009) (citations and punctuation omitted).

[6] *Ashe v. State*, 285 Ga. 359, 361 (2) (676 SE2d 194) (2009).

[7] *Phillips*, supra (citation omitted).

[8] See id. at 216-217 (2) (admission of other cumulative evidence rendered admission of defendant's un-*Mirandized* statement to detective harmless); *Frazier v. State*, 278 Ga. 297, 298 (4) (602 SE2d 588) (2004) (any error in the admission of a custodial statement was harmless beyond a reasonable doubt, where defendant's custodial statement merely repeated what he had earlier told an aunt and also admitted in his noncustodial statement to the first officer on the scene) (citing *Milton v. Wainwright*, 407 U. S. 371, 372-373 (92 SC 2174, 33 LE2d 1) (1972), for the principle that a constitutional error in the admission of an inadmissible confession was harmless because of other cumulative unchallenged confessions); *Baez v. State*, 297 Ga. App. 893, 895 (1) (678 SE2d 583) (2009) and cits. See generally *Chapman v. California*, 386 U. S. 18, 24 (III) (87 SC 824, 17 LE2d 705) (1967) (error of even constitutional magnitude may be harmless if, considering the entire record on appeal, the reviewing court finds beyond a reasonable doubt that the error did not contribute to the verdict); *Horne v. State*, 281 Ga. 799, 808-809 (5) (642 SE2d 659) (2007) (applying test set forth in *Chapman*, supra, and concluding that trial transcript showed that error of constitutional magnitude was harmless); *Jones v. State*, 265 Ga. 84, 86 (4) (453 SE2d 716) (1995) (assuming arguendo that contested statement was inadmissible hearsay and violated defendant's right of confrontation, under test set forth in *Chapman*, supra, error in its admission was harmless because statement "did not contribute to the conviction inasmuch as several eyewitnesses gave similar testimony" to content of contested statement).

presented no basis for reversal of his conviction[s]."[9]

2. Dailey contends that the trial court erred by denying his requests to charge the jury on the misdemeanors of pointing a gun at another[10] and reckless conduct[11] as lesser included offenses of the felony counts of aggravated assault committed against Sheldt and Smith. Those counts alleged that Dailey committed aggravated assault by "pointing a gun" at the respective victims. "[A] person who, using a deadly weapon, commits an act which places another in reasonable apprehension of immediate violent injury commits the felony of aggravated assault."[12] Dailey argues that he was entitled to have the jury charged on the cited misdemeanor offenses, asserting there was evidence that Sheldt and Smith were not placed in reasonable apprehension of immediately receiving a violent injury; additionally, Dailey argues that there was evidence that he did not intentionally point the gun at those two men. "Where a case contains some evidence, no matter how slight, that shows that the defendant committed a lesser offense, then the court should charge the jury on that offense."[13]

(a) *Pointing a gun at another*. Dailey is correct in that "[w]hat the assault statutes require in addition to an awareness by the victim that a pistol is pointed at [him] is a reasonable perception on [his] part of the danger of immediately receiving a violent injury."[14] He is also correct in that, "[i]f the victim is not placed in reasonable apprehension of immediate violent injury by the pointing of the firearm, only the misdemeanor of pointing a firearm (and not the felony of aggravated assault) has been committed."[15] His argument is nevertheless unavailing because of uncontradicted evidence that both Sheldt and Smith *were* placed in reasonable apprehension of immediately receiving a violent injury when Dailey pointed a gun at them. "If the pointing of a firearm places the victim in reasonable

---

[9] *Ashe*, supra (citation omitted).

[10] OCGA § 16-11-102 ("A person is guilty of a misdemeanor when he intentionally and without legal justification points or aims a gun or pistol at another, whether the gun or pistol is loaded or unloaded.").

[11] OCGA § 16-5-60 (b) ("A person who . . . endangers the bodily safety of another person by consciously disregarding a substantial and unjustifiable risk that his act or omission will cause harm or endanger the safety of the other person and the disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation is guilty of a misdemeanor.").

[12] *Rhodes v. State*, 257 Ga. 368, 369 (4) (359 SE2d 670) (1987) (citing OCGA §§ 16-5-20 (a) (2) (a person commits simple assault when he or she "[c]ommits an act which places another in reasonable apprehension of immediately receiving a violent injury"), 16-5-21 (a) (2) (a person commits aggravated assault when he or she "assaults . . . [w]ith a deadly weapon")).

[13] *Edwards v. State*, 264 Ga. 131, 133 (442 SE2d 444) (1994).

[14] *Manzano v. State*, 282 Ga. 557, 558 (2) (651 SE2d 661) (2007) (citations omitted).

[15] Id. (citation and punctuation omitted).

apprehension of immediate violent injury, then the felony of aggravated assault, rather than the misdemeanor of [pointing a gun at another] has occurred."[16]

Here, "[Sheldt's] apprehension of immediate violent injury was apparent — [he] fled in fright."[17] Sheldt testified that when he drove within about eight feet of Dailey, Dailey turned to face him, raised a gun, and pointed it at him. Sheldt testified that he ducked, "hit the gas pedal," and drove into a ditch, but nevertheless "just kept going." Sheldt testified that, as he was driving away, he reported the gunman to 911. Similarly, Smith testified that, when he encountered Dailey, Dailey looked directly at him, raised a gun, and pointed it at him; Smith testified that he discerned that Dailey had deliberately pointed the gun at him, and thus flagged down a police officer, less than a mile away, and reported that a gun had just been pointed at him.

Accordingly, as to Sheldt and as to Smith,

> [t]he only testimony was that the weapon was pointed as a threat and perceived as such, and therefore an assault. Although pointing a firearm at another is an offense included in aggravated assault, it is not error to refuse a charge on it when the evidence does not reasonably raise the issue that the defendant may be guilty only of the lesser crime.[18]

(b) *Reckless conduct.* Dailey correctly argues that the requisite intent for the aggravated assault counts was "only the criminal intent to *commit the acts* which caused the victim to be reasonably apprehensive of receiving a violent injury."[19] Dailey is incorrect, however, in his argument that evidence of his intoxication allowed for a finding that he did not have the requisite mental state — intending to point a gun at Sheldt or at Smith.

> Under Georgia law, one cannot be convicted of a crime where, due to *involuntary* intoxication, he or she lacks sufficient mental capacity to distinguish between right and

---

[16] *Savage v. State*, 274 Ga. 692, 695 (3) (558 SE2d 701) (2002) (citation omitted).

[17] Id.

[18] *Stobbart v. State*, 272 Ga. 608, 612 (3) (533 SE2d 379) (2000) (citation and punctuation omitted); see *Savage*, supra. Compare *Manzano*, supra at 558-559 (2) (evidence authorized a finding that the shooting victim did not perceive a danger of immediately receiving a violent injury, where defendant testified that he and the victim were engaged in horseplay, and both of them had believed that the pistol was unloaded and thus incapable of causing a violent injury).

[19] *Stobbart*, supra at 611 (3) (emphasis supplied).

wrong in relation to the actus reus. Involuntary intoxication means intoxication caused by consumption of a substance through excusable ignorance, or the coercion, fraud, artifice, or contrivance of another person. However, it has long been solidly established that voluntary intoxication shall not be an excuse for any criminal act or omission, except in the extreme situation where the intoxication has resulted in the alteration of brain function so as to negate intent, and even then, the brain function alteration must be more than temporary.[20]

Although Dailey relies upon evidence that he was intoxicated, he has cited no evidence that his intoxicated state was involuntary; nor has he cited any evidence that his intoxication resulted in any permanent brain function alteration. The evidence showed that Dailey committed the two counts of aggravated assault at issue here; evidence merely that he was intoxicated "does not make them anything less."[21]

[T]he only testimony was that in pointing the pistol at [Sheldt and Smith], he did so intentionally, not "consciously disregarding a substantial and unjustifiable risk that his act or omission would cause harm or endanger [their] safety," and consequently the trial court properly refused to give a jury instruction on reckless conduct.[22]

"Simply, there was no evidence that [Dailey] committed an unlawful act not a felony."[23] Accordingly, it was not error for the trial court to decline to charge the jury on the cited misdemeanor offenses.[24]

*Judgment affirmed. Andrews and McFadden, JJ., concur.*

---

[20] *Guyse v. State*, 286 Ga. 574, 578 (2) (690 SE2d 406) (2010) (citations and punctuation omitted).

[21] Id. at 579 (2) (rejecting argument that mere drunkenness rendered defendant incapable of forming intent necessary to commit aggravated assault because, where defendant's crime would have been aggravated assault had he been sober, defendant's voluntary intoxication did not make the crime anything less).

[22] *Stobbart*, supra, quoting OCGA § 16-5-60; see *Guyse*, supra; *Savage*, supra. Compare *Bowers v. State*, 177 Ga. App. 36, 39 (2) (338 SE2d 457) (1985) (finding evidence to support a charge of reckless conduct, where, although defendant admitted intentionally firing gun, he testified that, when he did so, he was engaged in target practice and was not aiming at the victim).

[23] *Savage*, supra (citation omitted).

[24] See id.

DECIDED JANUARY 31, 2012 — 

*Sharon L. Hopkins*, for appellant.
*Daniel J. Porter, District Attorney, Tracie H. Cason, Assistant District Attorney*, for appellee.