## S11A0585. HAMPTON v. THE STATE.
(713 SE2d 851)

NAHMIAS, Justice.

Lamar Hampton appeals from his convictions for the malice murder of Julian Smith, the aggravated assault of Kyzer Green, hindering the apprehension of a criminal, and tampering with evidence.[1] We affirm the malice murder and aggravated assault convictions, but we vacate the sentence for hindering the apprehension of a criminal and remand for misdemeanor sentencing on the tampering with evidence conviction.

1. The evidence at trial, viewed in the light most favorable to the verdict, shows that on September 18, 2003, Smith and his friend Green went to the Bridge Creek Apartments to visit Smith's girlfriend. When they were getting into their car to leave, a gunman began shooting at Smith, who told Green to run. Smith was hit four times in the head, once in the left shoulder, and once in the neck. He died as a result of his injuries. Green ran and was not hit by any bullets. Eyewitnesses could not identify the gunman because he was wearing a stocking over his head, but they testified that he leaned into Smith's car, shot him at close range, and then fled in a Grand Am style car with tinted windows. Other evidence, including testimony from co-indictees Robert Jones and Shawn Venisee, showed that Hampton believed that Smith had shot and killed his close friend and Venisee's brother, James Thomas, 18 days earlier and that Hampton orchestrated a hit on Smith that involved Blackshear as the shooter and Jones, Venisee, and Purvis Wallace in supporting roles. After the shooting, Hampton concealed Blackshear at his home

---

[1] The crimes occurred on September 18, 2003. On September 18, 2006, Hampton, Russell Blackshear, and Shawn Venisee were jointly indicted for the malice murder, felony murder, and aggravated assault of Julian Smith and the aggravated assault of Kyzer Green. Hampton, Venisee, Robert Jones, and Purvis Wallace were also charged with hindering the apprehension of a criminal (Blackshear), and those four and Blackshear were charged with tampering with evidence by concealing a 2001 Oldsmobile Alero and a .38 caliber revolver. Hampton was tried separately, and a jury found him guilty on all charges on September 27, 2007. He received a life sentence for malice murder and consecutive terms of years in prison for the aggravated assault of Green, hindering the apprehension of a criminal, and tampering with evidence. Hampton filed a timely motion for new trial, which he amended on April 16, 2009, and January 12, March 25, and March 29, 2010. The trial court denied the amended motion on May 14, 2010. Hampton filed a timely notice of appeal, and the case was docketed for the January 2011 term of this Court and submitted for decision on the parties' briefs. We previously affirmed Blackshear's convictions. See *Blackshear v. State,* 285 Ga. 619 (680 SE2d 850) (2009).

and directed that tinting be removed from the getaway car (a 2001 Oldsmobile Alero) and that the murder weapon (a .38 caliber revolver) be thrown away in a wooded area.

When viewed in the light most favorable to the verdict, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Hampton guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SC 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (citation and punctuation omitted)).

2. This Court has held that the offense of hindering the apprehension of a criminal, see OCGA § 16-10-50, is the equivalent of the common law crime of being an accessory after the fact and that a party may not be convicted both of being a principal to the crime and an accessory after the fact. See *Stanton v. State*, 274 Ga. 21, 22 (549 SE2d 65) (2001); *State v. Freeman*, 272 Ga. 813, 815 (537 SE2d 92) (2000); *Jordan v. State*, 272 Ga. 395, 396-397 (530 SE2d 192) (2000). Based on these cases, Hampton correctly contends that he may not be convicted for both malice murder and hindering the apprehension of a criminal, but he incorrectly argues that the remedy is to set aside his conviction for malice murder.

*Freeman*, on which Hampton relies, involved an unusual fact pattern that distinguishes it from this case and our other cases on this issue. Freeman was indicted for two counts of malice murder, but only one is relevant here. On that count, Freeman requested a jury charge on hindering the apprehension of a criminal, incorrectly asserting that it was a lesser included offense of murder. See 272 Ga. at 813-814; *Pressley v. State*, 207 Ga. 274, 280 (61 SE2d 113) (1950) (holding that the crime of being an accessory after the fact, of which hindering is a statutory equivalent, is not a lesser included offense of murder). The State, however, did not object, and the trial court incorrectly instructed the jury on hindering as a lesser included offense. The verdict form listed three offenses under the murder count: malice murder, felony murder, and hindering the apprehension of a criminal. See 272 Ga. at 814. The jury found Freeman not guilty of malice murder and guilty of the hindering charge but did not initially return a verdict on the felony murder charge. See id.

The trial court then directed the jury to attempt to reach a verdict on the felony murder charge, and the jury found Freeman guilty. See *Freeman*, 272 Ga. at 814. We concluded that the court erred by

requirng the jury to continue deliberations on the felony murder charge after it had found the defendant not guilty of

malice murder and guilty of the [supposedly lesser included offense of] hindering . . . . In other words, the jury was required to determine whether Freeman was a party to the crime of felony murder after it had already determined that he was an accessory after the fact.

Id. at 816. We therefore affirmed the trial court's subsequent decision to vacate the felony murder conviction. See id.

Here, by contrast, the trial court did not require the jury to determine whether Hampton was a party to the crime of murder after the jury had already determined he was an accessory after the fact. Instead, as in *Stanton* and *Jordan*, the jury returned a verdict on all counts at the same time. In these circumstances, this Court has ruled, both before and since *Freeman*, that it is the conviction for hindering that must be set aside. See *Stanton*, 274 Ga. at 22; *Jordan*, 272 Ga. at 396-397. See also *Thaxton v. State*, 184 Ga. App. 779, 780 (362 SE2d 510) (1987) (affirming the defendant's conviction for voluntary manslaughter but reversing his conviction for hindering). Accordingly, we vacate Hampton's hindering conviction but affirm his conviction for malice murder.

3. Hampton contends that the State proved that he tampered with evidence in his own case and not in the case of one of his co-defendants, so that he may be sentenced only for a misdemeanor. See *White v. State*, 287 Ga. 713, 717 (699 SE2d 291) (2010) (explaining that under OCGA § 16-10-94 (c), a person may receive only misdemeanor punishment for tampering with evidence in his own case). The indictment charged Hampton with tampering with evidence "to prevent the apprehension of Russell Blackshear, [himself], and Shawn Demetris Venisee." The indictment, along with the jury charge and the evidence, permitted the jury to find that Hampton tampered with the evidence in his case alone (a misdemeanor) or in either or both Blackshear's and Venisee's case (a felony). However, the verdict form simply contained a finding of guilty on the tampering count, making it impossible to determine if the jury found Hampton guilty of misdemeanor or felony tampering. Because Hampton must be given the benefit of the doubt in construing this ambiguous verdict, we vacate his felony tampering sentence and remand for misdemeanor sentencing. See *Lindsey v. State*, 262 Ga. 665, 665-666 (424 SE2d 616) (1993).

4. Hampton contends that the trial court erred in failing to grant him a new trial on the ground that the trial judge should have disqualified himself. Hampton argues that there was an appearance of partiality in the trial judge presiding over the trial because the judge's former law partner had represented the estate of one of the victims, Julian Smith, in a premises liability lawsuit against the

apartment complex at which Blackshear shot and killed Smith. See Ga. Code of Judicial Conduct Canon 3 (E) (1) (providing that "[j]udges shall disqualify themselves in any proceeding in which their impartiality might reasonably be questioned, including but not limited to instances where: . . . (b) the judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter").

Hampton first raised a recusal issue in his amended motion for new trial filed on January 12, 2010, summarily asserting that the judge "had a conflict of interest in being the trial judge." In another amended motion for new trial filed on March 25, 2010, Hampton alleged for the first time the specific ground for disqualification, although he did not support the motion with any affidavits. At the motion for new trial hearing, Hampton testified that he did not know about the partner's representation of Smith's estate until after his trial. The judge's partner filed the civil lawsuit in 2003, and the judge was elected to the bench in 2004 and left the firm in January 2005. The partner testified that no one knew who shot Smith during the course of the litigation, which settled in 2006. At the hearing, the trial judge stated that he had never heard of Hampton until the criminal trial and had no knowledge while he was at the firm or after he left that his partner represented Smith's estate. Hampton did not dispute the judge's statements, but he nevertheless contended that the partner's representation of Smith's estate raised a disqualifying appearance of partiality under Canon 3 (E). Following the hearing, the trial court summarily denied Hampton's amended motion for new trial.[2]

Although the trial court denied the recusal issue on the merits, we affirm that ruling on the preliminary ground that the motion was untimely. See *Gude v. State*, 289 Ga. 46 (709 SE2d 206) (2011) (affirming the denial of a motion to recuse under the right-for-any-reason rule). Uniform Superior Court Rule 25.1 provides that a recusal motion

> shall be timely filed: in writing and all evidence thereon shall be presented by accompanying affidavit(s) which shall fully assert the facts upon which the motion is founded. Filing and presentation to the judge shall be not later than five (5) days after the affiant first learned of the alleged

---

[2] At the motion for new trial hearing, Hampton also contended that there was an appearance of impropriety that arose from the law partner's representation of Hampton in a civil forfeiture action in federal court that began in 2004 and concluded in 2005, but he does not rely on this representation on appeal.

grounds for disqualification, and not later than ten (10) days prior to the hearing or trial which is the subject of recusal or disqualification, unless good cause be shown for failure to meet such time requirements.

Rule 25.3 states that when a motion to recuse is filed, the trial judge "shall temporarily cease to act upon the merits of the matter and *shall immediately determine the timeliness of the motion* and the legal sufficiency of the affidavit." (Emphasis added.) The Court of Appeals has said that "the first duty of such judge when a motion to recuse is filed" is to determine if it was timely. *Christensen v. State*, 245 Ga. App. 165, 171 (537 SE2d 446) (2000).

Here, letters that Hampton filed with the trial court show that he and his attorney knew of the purported ground for recusal at least two months before the January 12, 2010, amended motion for new trial that summarily raised the issue and at least four months before the March 25, 2010, amended motion for new trial that first alleged the facts on which the disqualification claim was based. Thus, the issue was not raised in a timely fashion, even assuming that an enumeration of error in an amended motion for new trial, rather than a motion to recuse with accompanying affidavits, is a proper method by which to raise a recusal issue. But see *Christensen* at 172 (holding that "[a]n extraordinary motion for new trial based upon newly discovered evidence is an improper vehicle to raise a motion to recuse").

In *Thurman v. State*, 249 Ga. App. 390 (547 SE2d 715) (2001), the Court of Appeals addressed a similar situation. Thurman discovered after his conviction and while his motion for new trial was pending that the prosecutor had been the trial judge's former law clerk. Thurman waited, however, about seven months after learning that information to file a motion to recuse. See id. at 390. The Court of Appeals held that Thurman did not timely raise the recusal issue and affirmed the trial court's denial of the motion. See id. at 390-391. Likewise, in *Christensen*, the defendant filed a motion to recuse after his conviction that was based on grounds that occurred during and after trial (as well as an extraordinary motion for new trial on the same grounds). See 245 Ga. App. at 170-171. Because the "most recent in time grounds" for disqualification occurred 48 days before filing the motion to recuse, the Court of Appeals held that the motion was untimely. Id. at 171.

Here, Hampton waited much longer than five days after learning of the alleged ground for disqualification to raise the issue, and he made no attempt to show "good cause" for not raising the issue earlier. See USCR 25.1; *Christensen*, 245 Ga. App. at 171 (holding that the party seeking disqualification has the burden of asserting and showing "good cause"). The trial court therefore did not err in

denying the recusal claim.

5. Hampton contends that the trial court erred in refusing to allow him to question Robert Jones, a co-indictee who testified for the State, about the amount of the bond that Jones received following his arrest on a murder charge in this case. "Defense counsel is entitled to a reasonable cross-examination on the relevant issue of whether [a] witness entertained any belief of personal benefit from testifying favorably for the prosecution." *State v. Vogleson*, 275 Ga. 637, 639 (571 SE2d 752) (2002). However, " 'the extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court,' " so long as the court does not "cut[ ] off all inquiry on a subject on which the defense is entitled to reasonable cross-examination." Id. at 639-640 (citation omitted).

The trial court here allowed Hampton considerable leeway to question Jones about his motive to testify favorably for the State as well as many other credibility issues. Hampton was permitted to ask Jones if he had any outstanding criminal charges pending against him, and Jones acknowledged that he had been arrested for making a false statement to the police and for murder. Hampton also questioned Jones about, and Jones denied having, any deals with or promises from the State in exchange for his testimony.

The amount of Jones' bond would not, by itself, indicate that he had any reason to testify "in an effort to please the prosecution." *Vogleson*, 275 Ga. at 639. Hampton did not try to ask Jones whether the State had agreed not to oppose his request for a bond or had sought a reduced bond for him. Hampton had already denied any deals with or promises from the State, so if bias for the State was the ground on which Hampton contended his question was relevant, he needed to so advise the trial court and establish a foundation for the question. This case is therefore unlike *Manley v. State*, 287 Ga. 338 (698 SE2d 301) (2010), where the defendant was barred from asking a testifying co-defendant about the fact that *her deal with the State* reduced her minimum time in prison from 30 years to two years (although that error was found to be harmless). See id. at 343. This case is also unlike the one on which Hampton relies, *Younger v. State*, 288 Ga. 195 (702 SE2d 183) (2010), where the defendant was precluded from asking a testifying co-indictee if *the State had consented* to his bond (although the Court again found that any error was harmless). See id. at 199. Had there been evidence that Hampton believed that his bond amount was a " 'result of his cooperation' " or was related to " 'decisions made by the district attorney in exchange for the witness's cooperation and testimony for the State,' " *Manley*, 287 Ga. at 340-341 (citation omitted), then the trial court's ruling might have been erroneous. See also id. at 343

(explaining that, at a minimum, " 'the witness would need to understand the parole disparity and its connection to the district attorney's charging decisions for the issue to be open to cross-examination, as witnesses cannot be influenced by matters about which they are unaware.' " (citation omitted)).

Accordingly, the amount of Jones' bond was at most marginally relevant to his credibility, and it was not at all "pertinent to the bias [toward the State] of a co-indictee witness," as the special concurrence incorrectly suggests. The trial court did not abuse its broad discretion to control cross-examination in this case.

6. Hampton finally contends that the trial court erred by considering in aggravation of punishment two of his prior convictions which resulted from guilty pleas that the State admitted were uncounseled. However, while Hampton objected to the court's consideration of the uncounseled pleas, he did not obtain a ruling on his objection and therefore failed to preserve the issue for appeal. See *Smith v. Stacey*, 281 Ga. 601, 602 (642 SE2d 28) (2007). In any event, although the trial court imposed maximum and consecutive sentences for Hampton's convictions, the record does not indicate that the court relied on these prior convictions in any way, and the court had the authority to enter those sentences regardless of any prior convictions. See OCGA § 17-10-1 (a) (1) (providing that a trial court has the authority to enter a sentence "within the minimum and maximum ... prescribed by law"); OCGA § 17-10-10 (a) (granting trial courts the authority to impose consecutive sentences for multiple convictions on one indictment). We therefore cannot assume that the trial court relied on the prior convictions in sentencing Hampton. See *State v. Lynch*, 286 Ga. 98, 100 (686 SE2d 244) (2009) (explaining that trial courts are presumed to consider only relevant, legal evidence); *Simmons v. State*, 249 Ga. 860, 861 (295 SE2d 84) (1982) (same).

*Judgment affirmed in part and vacated in part, and case remanded for resentencing. All the Justices concur, except Hunstein, C. J., who concurs specially.*

HUNSTEIN, Chief Justice, concurring specially.

I write specially to point out that the holding in Division 5 in this case is inconsistent with the majority opinion in *Manley v. State*, 287 Ga. 338 (2), (3) (698 SE2d 301) (2010) regarding the permissible limits a trial court may place on the scope of defense counsel's cross-examination of a co-indictee. Indeed, the inconsistency is so great that I can only conclude that the majority has overruled sub silentio the contrary holding in *Manley*. Having concurred specially in *Manley* to the majority's unwarranted incursion on the broad discretion previously granted trial courts in regard to the scope of cross-examination, I agree with the majority that there was no abuse

of that discretion in this case even though the trial court barred cross-examination that was far more pertinent to the bias of a co-indictee witness than in *Manley*.

In order to understand the inconsistency between this case and *Manley*, it is necessary to review the role each co-indictee played in his or her respective charged crimes and the nature of the topic upon which cross-examination was deemed duly (in this case) or erroneously (in *Manley*) limited.

In *Manley*, co-indictee Alexandria Phillips was a friend of the victim who told her co-indictees about the victim's home recording studio and the cash the victim kept on hand. The others decided to rob the victim and, on the night of the crimes, called Phillips to get directions to the victim's home. Phillips herself did not go to the scene; the evidence established that she only spoke on several occasions with co-indictee Allen about the victim's movements and made, on behest of the co-indictees, one call to the victim that went unanswered because the victim was not at home. During the course of the armed robbery, the victim was shot and killed by the co-indictees.

In this case, co-indictee Robert Jones was an employee of Hampton and a friend of the man whose murder was the motive for the murder of the victim. Jones not only rented and had tinted the windows to the vehicle used to transport the shooter, Blackshear, to and from the crime scene, Jones personally drove the vehicle and waited within view as Blackshear approached the victim's car, shot the victim repeatedly through the window of the car and then ran back to rejoin Jones who already had the vehicle in motion as they sped away from the scene. Although Jones denied it at trial, the police officer to whom Jones confessed testified that Jones indicated he had personally disposed of the murder weapon. When questioned by police investigators, Jones originally lied about renting the vehicle and claimed that his driver's license had recently been stolen and that someone else must have used the stolen license to rent the vehicle.[3] Based on these lies, Jones was arrested for giving a false statement to police but subsequently cooperated with the investigation, including taking officers to the location of the murder weapon. Jones's assertion at trial that he did not know that he was driving Blackshear to the crime scene specifically to enable Blackshear to murder the victim was directly rebutted by co-indictee Venisee, who

---

[3] As the GBI special agent testified at trial, Jones did not correct his statement even after he was confronted with the fact that, in order to have completed the vehicle rental agreement form, the "someone else" would also have needed the name and address of Jones's grandmother and Jones's social security number, information that was not on Jones's allegedly stolen current driver's license.

testified against Hampton on behalf of the State, and by the statement Hampton gave to police, in which he asserted that Jones "had to play his rol[e] in it" by identifying the murder victim to Blackshear.[4]

Phillips, for her actions in assisting the armed robbery plans of her co-indictees in *Manley*, was indicted for murder. Jones, for his actions in assisting Blackshear to murder the victim in this case, was originally arrested for murder and giving a false statement; however, the record establishes that he was actually indicted only on charges of tampering with evidence and hindering the apprehension of a criminal.

In *Manley*, Phillips testified against the defendants and readily admitted that she was doing so because her testimony was a condition of the deal she negotiated with the State to drop the murder charge (with its mandatory sentence of life in prison) in exchange for her guilty plea to a six-years-to-serve sentence for aggravated assault. Under the relevant statutes, Phillips would not have been eligible to be considered for parole until she served 30 years of a sentence on a murder conviction but would be eligible to be considered for parole — though, of course, by no means entitled to be granted parole — after two years of imprisonment under the plea deal on the aggravated assault. At trial, the defendants were allowed to ask Phillips about the length of her sentence and her reasons for testifying as a result of the deal but were not allowed to question her about her understanding of the parole eligibility differential.

In this case, Jones testified on direct examination that he was employed and currently "work[ing] at a tobacco warehouse in Huzlehurst [sic]." Despite his testimony on direct in which he admitted he rented the car, drove the shooter to and from the crime scene and knew where the murder weapon was hidden, Jones on cross-examination denied that he recognized the arrest warrants issued against him for murder and false statement and testified that he "ha[d] no idea" what criminal charges were currently pending against him. He acknowledged he was out on bond and, when asked "[w]hat charges are you out on bond for?" answered "I think it's a murder charge." But when defense counsel next asked Jones "[h]ow much is your bond?" the prosecutor objected on grounds of relevancy and the trial court sustained the objection.[5] Defense counsel then

---

[4] In fact, the record reveals that, less than two weeks before his trial, Hampton complained to two deputies that he (Hampton) should not be facing a life sentence when it was Jones who "should be in jail but instead [Jones] is out comforting [the victim's mother]."

[5] Given that the trial court sustained the State's objection on the basis that the bond issue was "irrelevant," Hampton would have no legitimate reason to "try to ask Jones whether the State had agreed not to oppose his request for a bond or had sought a reduced bond for

turned to a different line of questioning.

In *Manley* the majority held that the trial court, despite allowing defense counsel to question the co-indictee fully about the plea deal that was her admitted reason for testifying, had nevertheless abused its discretion and committed error when it drew the line at cross-examining the co-indictee about her understanding of when she might possibly be considered for parole. In this case, the trial court allowed the jury to hear only the fact that a co-indictee intimately involved in the planned murder of the victim was walking around a free man on bond, yet the majority holds there was no abuse of discretion or error committed by the trial court's ruling blocking cross-examination on the "marginally relevant" issue of the amount of Jones's bond. That was because, according to the majority, the amount of bond by itself would not "indicate that [Jones] had any reason to testify 'in an effort to please the prosecution.' [Cit.]" Maj. Op. p. 626.

The majority in *Manley*, in holding that the trial court's cross-examination limitation was error, relied on a special concurrence by the author of the majority opinion in this case, recognizing that the partiality of a witness is subject to exploration at trial and is always relevant as discrediting the witness and affecting the weight of his testimony, *Manley*, supra at 340 (2); that this principle is particularly important with witnesses who have substantial incentives to cooperate with the government, id.; and that defense counsel is entitled to a reasonable cross-examination on the relevant issue of whether a witness entertained any belief of personal benefit from testifying favorably for the prosecution. Id. Where a defendant is seeking on cross-examination to elicit "objective evidence" that the witness knows and understands that he or she has received a real, that is, concrete benefit that could influence his or her testimony, it is a legitimate subject for cross-examination that the defendant is entitled to make known to the jury. Id. at 340-342 (2).

The amount of bond that enables a co-indictee, despite his significant involvement in the actual commission of a murder, to avoid on-going incarceration unquestionably constitutes a concrete benefit that could influence his testimony and that would serve as objective evidence pertaining to the co-indictee's potential bias in testifying favorably for the prosecution. This is particularly true if his freedom comes as the result of a reduced amount of bail that enables even a person of modest means to make bond. The immediate impact of the benefit provided by a reduced bond — financially

---

him," as the majority in hindsight suggests. Maj. Op. p. 626. I thus cannot agree with the majority that the failure to ask such questions supports its holding.

enabling the co-indictee the freedom to live his life and maintain gainful employment — cannot reasonably be considered less influential or less significant to the legitimate subject of witness partiality than the bias stemming from the understanding of an incarcerated co-indictee regarding the possibility that she may be considered for parole years in the future.

Given that *Manley* found it an abuse of discretion for a trial court to limit cross-examination as to a co-indictee's parole eligibility differential as an unquestionably real benefit that could influence a witness's testimony, application of the *Manley* rationale here would seem to compel the same result, namely, that the trial court abused its discretion in refusing to allow Hampton to explore the amount of bond Jones paid to gain his freedom during the pendency of criminal charges against him because the amount set for Jones's bond "might have provided [Jones] with bias in favor of or motivation to assist the State." *Manley*, supra at 343 (2). Accordingly, under *Manley*, the trial court should be deemed to have erred by limiting Hampton's cross-examination of Jones regarding the amount of bond, an error that might be deemed harmless in light of the overwhelming evidence of guilt. The majority, however, did not apply the *Manley* analysis but instead resolved the challenge to the trial court's exercise over the scope of cross-examination in a manner completely consonant with the special concurrence in *Manley*, i.e., that there can be no abuse of the trial court's discretion when it limits cross-examination on marginally relevant issues, such as the parole eligibility aspects of a plea agreement or, here, the amount of bond that allows a co-indictee to live the life of a free man. Id. at 349 (1) (Hunstein, C. J., concurring specially). I would hold that the majority is correct that the bond amount was indeed marginally relevant to the issue of the co-indictee's potential bias, a finding which, although deemed by the majority in *Manley* to "def[y] reason" as to the tangential evidence of Phillips' parole eligibility, id. at 344 (2), is as reasonable a finding here as it was in *Manley*. However, I would also recognize that the majority's position in Division 5 is inconsistent with the holding in *Manley* and, given that it is authored by the same judge who authored the core analysis of *Manley*, this case must be construed as overruling *Manley* sub silentio, a result with which I heartily agree. It is for this reason that I concur in the majority's holding and in its sub silentio overruling of *Manley*, supra.

DECIDED JULY 8, 2011 —
RECONSIDERATION DENIED JULY 21, 2011.

*Timothy L. Eidson*, for appellant.
*Denise D. Fachini, District Attorney, Cheri L. Nichols, Assistant*

*District Attorney, Thurbert E. Baker, Attorney General, Mary Beth Westmoreland, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Sheila E. Gallow, Assistant Attorney General,* for appellee.