**THIRD DIVISION**
**MILLER, P. J.,**
**RAY and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**March 25, 2013**

# In the Court of Appeals of Georgia

A12A2349. DAVIS v. THE STATE.

MILLER, Presiding Judge.

Convicted of three counts of aggravated assault,[1] (OCGA § 16-5-2 (a) (2)) Donald Maurice Davis appeals from the denial of his motion for new trial, contending that the trial court erred in not admitting evidence of a juvenile charge pending against one of the victims, in allowing into evidence his custodial statements, and in denying his motion for directed verdict. Finding no error, we affirm.

On appeal from a criminal conviction, we view the evidence in a light most favorable to the verdict and Davis no longer enjoys a presumption of innocence. *Bryant v. State*, 304 Ga. App. 755, 755 (1) (697 SE2d 860) (2010). "We do not weigh

---

[1] Count 1, victim William Marsh; Count 2, victim Demonte Jackson; Count 3, victim Christopher Howard.

the evidence or resolve issues of witness credibility, but merely determine whether the evidence was sufficient to find [Davis] guilty beyond a reasonable doubt." (Citation and punctuation omitted.) Id.

So viewed, the evidence was that William Marsh and Demonte Jackson were friends who had grown up within blocks of each other in the same DeKalb County neighborhood. Both Marsh and Jackson knew Eddie Trammell, who also grew up there. Christopher Howard was Marsh's uncle and also lived in the area. Howard, a private investigator, was trained in the use of firearms and licensed to carry one. Howard knew Jackson because he spent time with Marsh at Howard's house.

On June 8, 2008, Marsh and Jackson had been hanging out together all day and had been playing video games at the home of Marsh's cousin, Jamal Banks, that evening. Around 9:30 p.m., Marsh, in his mother's blue Toyota Corolla, drove Jackson home, and Banks rode along. As they got out of the car at Jackson's house and began walking up his driveway, they noticed Trammell and a couple of men standing on the corner near the house. Trammell approached Jackson and a fight ensued between Jackson and Trammell based on a prior disagreement. According to Marsh, Trammell and his associates were "packing guns." Marsh stepped between

Jackson and Trammell. Marsh, Jackson, and Banks then got back in the Corolla and went to a party about a mile from their neighborhood.

Marsh left the party around midnight to drive Jackson home. On the way, Marsh's cell phone rang and Jackson answered it to hear Trammell yelling about the fight. Jackson gave Marsh the phone and the yelling continued. As they were approaching Jackson's house, a silver Jeep Cherokee pulled adjacent to the driver's side of the Corolla and shots were fired from the Jeep into the Corolla, striking Marsh and Jackson. Marsh pulled off, followed by the Jeep, and called Howard to tell him about the situation. Howard told Marsh to drive to his subdivision, pull into the first cul-de-sac, and he would meet them there. Marsh drove into the cul-de-sac, and he and Jackson got out and ran toward Howard's house, using different routes.

When Howard arrived in his Charger at the cul-de-sac, he saw the Corolla parked with no one in it, and blood on the dashboard and seats. Howard then heard gunfire and saw the Jeep Cherokee coming toward him with gunfire coming out the windows. Howard was struck by at least two shots. As the Jeep approached him, Howard began firing back. Howard saw two people in the front seat and at least one person in the back seat who was firing at him. Howard saw the face of the shooter by the light of a muzzle flash and described him as heavy set, with dreds. During his

return fire, Howard was certain that he had hit the shooter firing at him. At trial, Howard identified Davis as the shooter and stated that he was "110 percent" certain of his identification. Marsh and Jackson both identified Trammell as the one who shot them.

After the Jeep fled, Howard returned to his home where he found Marsh and Jackson, both wounded. Howard's wife had called police and all three victims were transported to a hospital.

Trammell[2] drove the Jeep to a nearby Shell station and abandoned it. Officers later found the Jeep with several bullet holes in it and glass missing from the back window. Two cartridge casings were found on the rear passenger floorboard. Davis was picked up by a friend at the Shell Station and taken to Southern Regional Hospital.

Quinton Wright, another childhood friend of Davis, testified regarding a similar transaction introduced to show Davis's course of conduct. Wright testified that, in 2007, he was visiting with his girlfriend, Davis's sister. Wright was disciplining his girlfriend's son when Davis objected and the two men got into a fight. After the

---

[2] Trammell was tried by a jury before Davis's trial and convicted on all three counts of the indictment.

4

girlfriend separated the two, Davis pulled a gun from the back of his pants and pointed it at Wright. Davis left the house when police were called. Later that day, Davis was in a car that pulled alongside Wright's car and Davis, sitting in the rear seat, fired at Wright and struck his car twice.

1. Davis's first enumeration is that the trial court erred "by failing to admit evidence of a juvenile case which was pending against a primary state witness at the time the witness gave his statement to police." We disagree.

During her cross-examination of victim Jackson, defense counsel advised the trial court that she wished to question Jackson about a "burglary charge that was pending at the time of the fight between [him] and Eddie Trammell." Defense counsel pointed out that Jackson and Trammell were charged as co-defendants in Juvenile Court for a burglary which occurred in October 2007. Defense counsel wanted to cross-examine Jackson to show that his relationship with Trammell was strained by the pending charge and, and this evidence would go to Jackson's motive when giving a statement to the police.

When asked by the trial court to respond to the State's objection that this had *no relevance regarding Davis*, defense counsel stated:

5

the case is going to come down to the credibility of the three core witnesses, Marsh, Jackson, and Howard, and although Marsh and Jackson have not identified Davis as the shooter, Howard is going to come in here and say that, so their credibility to me is linked. They are all three together. They come to court together. They hang out together all the time, so a dent in one's credibility, I believe, can apply to the other, and there were omissions left out to the officers. There have been omissions from the stand, and it's a matter of attacking their credibility.

First, we note that, although the Sixth Amendment right to confrontation secures the right of cross-examination, *Davis v. Alaska*, 415 U. S. 308, 315 (2) (94 SC 1105, 39 LE2d 347) (1974), the right of cross-examination "is not an absolute right that mandates unlimited questioning by the defense[.]*" Howard v. State*, 286 Ga. 222, 225 (2) (686 SE2d 764) (2009) (citation and punctuation omitted). To the contrary, trial courts "retain wide latitude . . . to impose reasonable limits on cross-examination based on concerns about, among other things . . . interrogation that is . . . only marginally relevant." *Young v. State*, 290 Ga. 441, 444 (5) (721 SE2d 839) (2012) (citation and punctuation omitted); see also *Sanders v. State*, 290 Ga. 445, 446 (2) (721 SE2d 834) (2012). The permissible scope of cross-examination is committed to the sound discretion of the trial court, and we review a limitation of the scope of

6

cross-examination only for abuse of discretion. *Hampton v. State*, 289 Ga. 621, 626-627 (5) (713 SE2d 851) (2011) .

Further, unlike the argument presented here based on the Sixth Amendment right to confrontation and *Davis v. Alaska*, supra, the argument below was premised on attacking the group credibility of the three victims. Having made no objection below based on his right to confrontation, Davis has waived his right to raise such an objection on appeal. See *Walker v. State*, 282 Ga. 703, 706 (4) (653 SE2d 468) (2007); *Weeks v. State*, 316 Ga. App. 448, 450 (1) (729 SE2d 570) (2012).

2. In his second enumeration, Davis contends that the trial court erred "by allowing admission of appellant's custodial statements" because he was not given *Miranda* warnings. We disagree.

"*Miranda* protections adhere when an individual is (1) formally arrested or (2) restrained to the degree associated with a formal arrest. A court should evaluate the second prong of the test objectively; an individual is in custody if a reasonable person in the place of the defendant would feel so restrained as to equate to a formal arrest." (Citations and punctuation omitted.) *Tolliver v. State*, 273 Ga. 785, 786 (546 SE2d 525) (2001).

"When an appellate court reviews a trial court's grant or denial of a motion to suppress, the trial court's findings as to disputed facts will be upheld unless clearly erroneous and the trial court's application of the law to undisputed facts is subject to de novo review." *State v. Nash*, 279 Ga. 646, 648 (2) (619 SE2d 684) (2005).

The trial court found that Davis was not in custody at the time he made his first statement to Detective Houlroyd at Southern Regional Hospital.

During the *Jackson/Denno*[3] hearing, Davis testified that, while in the emergency room at Southern Regional Hospital being treated for a gunshot wound to the head, he was conscious, but not alert. According to Davis, his first interaction with a police officer was 45 minutes after he arrived at the hospital when a uniformed officer asked him if he knew who shot him. Davis responded that he did not know who shot him and the officer[4] said "okay" and left the room. Then, Davis's mother arrived, and he talked to her for about 30 minutes.

---

[3] See *Jackson v. Denno*, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964).

[4] This was apparently a Clayton County officer since Southern Regional Hospital is located there.

DeKalb Detective Houlroyd was sent to Southern Regional "to locate the *victim* of the crime, look at his injuries, and if the person is able to speak, then we are tasked with getting a written statement from them." (Emphasis supplied.) Houlroyd located Davis in a trauma room being treated by medical staff at approximately 4:45 a. m. According to Houlroyd, Davis was not restrained in any way and, had he wanted to get up and leave, he was free to leave. At no point during his testimony did Davis state that he expressed the desire to leave or that he was told he could not leave. His only assertion was that he was told by one of the Clayton County officers that he needed to wait and talk to the DeKalb detective. Davis acknowledged that he had not been released from treatment or discharged at the time he spoke with Houlroyd.

When Houlroyd asked Davis what happened, Davis stated that

I was coming from Whitehall Forest, when I was about to turn onto Bouldercrest, I got shot as I past the wishing well. I just saw a flash, pow, and my ears were ringing. I wrecked my jeep, it's a gray one. I pulled into the Shell station. A guy named "D" took me to the hospital. He just happened to pull into the Shell station, after I got out the car and was about to run into the Shell station.

Davis signed the statement transcribed by the detective and Houlroyd left the hospital and returned to his DeKalb County office.

9

Davis argues that *Miranda* warnings were required because interviewing Detective Houlroyd, "told [him] he was only free to leave after he gave his statement" and because "visitation with [him] was restricted."

In support of this argument, Davis cites only to argument by the prosecutor and Davis's defense counsel, which are not evidence. See *Baker v. State*, 316 Ga. App. 122, 125 (5) (728 SE2d 767) (2012) (argument of counsel is not evidence.); *Holsey v. State*, 316 Ga. App. 801, 805 (2) (729 SE2d 465) (2012) (trial court instructs jury that arguments of counsel are not evidence.)

As indicated by Davis's statement above regarding his visit with his mother, there is no evidence that he was isolated.

"When [Davis] spoke to the law enforcement officers at the hospital, he had not been released from medical treatment or told by medical personnel that he could leave the hospital.[5] More significantly, he was not isolated by police for questioning. Thus, he was in a medical, rather than an investigative setting." (Citations and punctuation omitted.) *Jennings v. State*, 282 Ga. 679, 681 (3) (653 SE2d 17) (2007). Moreover, Davis was initially questioned by Houlroyd as a victim and not as a potential suspect. Therefore, the evidence supports the trial court's finding that Davis

---

[5] In fact, Davis spent the night at the hospital after being moved to a room.

10

was not in custody for the purpose of *Miranda* at the time he made his initial statement to Houlroyd. He was fully advised of his *Miranda* rights before the later statement given to Detective Kitchen after he was summoned by Davis to talk to him at the hospital.

3. Davis argues that the trial court erred in denying his motion for a directed verdict on the counts involving victims Marsh and Jackson, as there was insufficient evidence that Davis fired shots at them and "there was no evidence to exclude every reasonable hypothesis of innocence."

We review the denial of this motion under the same standard as that used to review the sufficiency of the evidence. We view the evidence with all inferences in favor of the verdict, determining only the legal sufficiency of the evidence, and not weighing the evidence or determining the credibility of the witnesses. *Slaughter v. State*, 289 Ga. 790, 792-793 (2) (716 SE2d 180) (2011).

Davis argues that only his "mere presence" and "mere association" with Trammell were shown and that was insufficient to support his conviction.

Here, a review of the record reveals more than mere presence and association. In his custodial statement given to Kitchen, Davis said that he received a telephone call from "Weezy" who asked to borrow a bullet clip because someone shot at his

11

cousin. Davis took his .45 caliber clip, gave it to Weezy, and went for a ride with Weezy and his cousins in a Jeep for about an hour to look for the shooter. Davis said they were looking "for a guy in like a blue Corolla." According to Davis, they located the blue car and Weezy shot at it. Then, they drove into a cul-de-sac and saw a Charger with a guy with a gun standing outside of it and that is when Davis got shot.

Although Davis denied having anything to do with the shootings of Marsh and Jackson, even if he was not involved in all of the crimes charged, those offenses could be imputed to him as an accomplice or co-conspirator because of his actions as a party to the shooting of Howard. See *Teasley v. State*, 288 Ga. 468, 470 (704 SE2d 800) (2010); *Beadles v. State*, 259 Ga. 519, 522 (1) (385 SE2d 76) (1989). Therefore, we find no error in the trial court's denial of Davis's motion for directed verdict.

*Judgment affirmed. Ray and Branch, JJ., concur.*