303 Ga. 78
FINAL COPY

S17A1354.  NORWOOD v. THE STATE.

HUNSTEIN, Justice.

Appellant Cassandra Norwood appeals her convictions for crimes related to the death of her newborn child, Josiah Lucas Norwood.[1]  In her sole enumeration, Appellant alleges that the trial court erred by admitting her two statements made to law enforcement officers.  Finding no error, we affirm.

---

[1]  On January 29, 2013, a Clarke County grand jury indicted Appellant for malice murder, felony murder predicated on aggravated assault — family violence, aggravated assault — family violence, and three counts of possession of a knife during the commission of a crime.  Following a trial that took place from May 19-21, 2014, the jury found Appellant guilty of all charges.  The trial court sentenced Appellant to life in prison for malice murder and five years to be served consecutively for possession of a knife during the commission of a crime.  The charge of felony murder was vacated as a matter of law and the remaining charges merged.  On May 30, 2014, Appellant filed a motion for new trial.  The trial court held a hearing on the motion on May 26, 2016, and denied the motion on December 15, 2016.  Appellant filed a notice of appeal on December 20, 2016 and, upon receipt of the record, the case was docketed to the August 2017 term of this Court.  The case was orally argued on August 28, 2017.

Viewing the evidence in a light most favorable to the jury's verdicts, the record shows that, at the time of the incident, unbeknownst to her family and the father of the child, Appellant was 40 weeks pregnant (full term). She was also unemployed and living at her parents' house along with her two sisters, Ginger and Bethany Norwood, and Ginger's two young daughters.

On the night of October 31, 2012, Appellant went trick-or-treating with her sisters and nieces, went out to dinner, and then went to bed upon returning home. The next morning, when Ginger went into the bathroom she shared with her sisters, she noticed small amounts of blood on the toilet and near the drain in the bathtub. Ginger did not think anything of the blood and continued to get ready for work. When Ginger asked Appellant the location of her work shoes, she recalled that Appellant was acting strange, and "just seemed kind of spacey." Upon entering Appellant's room to look for her shoes, Ginger noticed a strong smell of body spray and saw more bloodstains on the floor.

Ginger mentioned Appellant's strange behavior and the blood to their sister Bethany, a trained nurse. When Bethany entered Appellant's room, she also noticed blood on the floor and dried blood on Appellant's feet. A plastic

2

garbage bag filled with bedding was situated in the corner; a comforter with spots of clotted blood was visible from the top of the bag. When Bethany tried to examine the contents of the garbage bag, Appellant would not let her, explaining that the presence of the blood was due to an accident associated with her heavy menstrual cycle. But Bethany believed the amount of blood to be abnormal. Eventually Appellant agreed to go to the hospital and, as Appellant left the house with her parents, Bethany found the newborn baby, along with the placenta and the umbilical cord, inside the garbage bag. Bethany administered CPR to the child while Ginger called 911.

When police and paramedics arrived, they confirmed that the child was deceased. Two bloodied knives were found in the room — one was behind the child's leg and the other was located underneath a pile of sheets on the bed in Appellant's room. DNA samples taken by officers during their investigation confirmed that Appellant was the child's biological mother. Appellant's gynecological records indicated that she had visited a doctor on August 22, 2012, believing, at that time, that she was ten weeks pregnant. After some tests and a sonogram, Appellant learned that she was 30 weeks pregnant. Prior to leaving the doctor's office, Appellant changed her HIPAA

3

(Health Insurance Portability and Accountability Act) form, removing her parents' names so they would not be privy to the results of her medical exam. Appellant failed to return to the doctor for her scheduled follow-up appointment.

The autopsy report showed that the infant was born alive and then suffered dozens of stab wounds to the neck, torso, and back. The medical examiner testified that the cause of death was sharp force wounds to the neck and abdomen, and that the manner of death was homicide.

While in recovery at the hospital, Appellant spoke with law enforcement on two separate occasions. During these interviews, Appellant told officers that she had previously visited the doctor and discovered she was pregnant; however, Appellant hid this information from her family and the father of her child. Regarding the incident, Appellant stated that, sometime after she fell asleep the night of October 31, she began experiencing contractions. Eventually, because of the pains, Appellant got out of bed and took a bath. Upon returning to her room, Appellant went into labor and, sometime before 10:00 a.m. on November 1, 2012, she gave birth to her son. Appellant told officers that during the delivery, she obtained a

kitchen knife in order to cut the umbilical cord. According to Appellant, she accidentally cut the infant's neck while cutting the cord and, once she noticed the cut, she wrapped the baby in some bedding and placed a compress on the child's neck in an attempt to stop any potential bleeding. Appellant also acknowledged that she hid the pregnancy from her family and the father of her child, and that she did not take any actions in preparation for the birth of the child, such as obtaining prenatal care or buying items for the newborn.

1. Though not enumerated by Appellant, we find that the evidence as summarized above was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that Appellant was guilty of the crimes for which she was convicted. Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Appellant's sole enumeration of error concerns the admission into evidence of the two audio-recorded statements she made to police while at the hospital.[2] "The trial court determines the admissibility of a defendant's statement under the preponderance of the evidence standard considering the

---

[2] During oral argument, counsel withdrew Appellant's second enumeration of error as set forth in their brief; consequently, that issue will not be reviewed by this Court.

totality of the circumstances." (Citation omitted.) <u>Vergara v. State</u>, 283 Ga. 175, 176 (657 SE2d 863) (2008). "Although we defer to the trial court's findings of disputed facts, we review de novo the trial court's application of the law to the facts." <u>Clay v. State</u>, 290 Ga. 822, 822-823 (725 SE2d 260) (2012). We "will not disturb the trial court's factual and credibility determinations unless they are clearly erroneous," <u>Wright v. State</u>, 285 Ga. 428, 432 (677 SE2d 82) (2009); however, "'[w]here controlling facts are not in dispute, . . . such as those facts discernible from a videotape, our review is de novo.'" <u>Vergara</u>, 283 Ga. at 178 (citation omitted).

Prior to trial, Appellant filed a motion to suppress her two statements, claiming that they were not freely and voluntarily given. The evidence adduced at the pre-trial <u>Jackson v. Denno</u>[3] hearing on Appellant's motion shows that, on November 1, 2012, officers spoke with Appellant in her hospital room on two separate occasions. The first recorded interview was conducted by Sergeant Jonathan Patterson just after 4:00 p.m. During this conversation, which lasted 17 minutes, Appellant provided a general overview of the incident. Namely, Appellant stated that she was awakened

---

[3] 378 U. S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

the prior evening when she started to feel contractions; she relayed that she took a bath and, when she returned to her room, she went into labor. Thereafter Appellant went to the kitchen to retrieve a knife, went back to her room, delivered the baby, and then accidentally cut the infant's neck while attempting to sever the umbilical cord. She explained that she placed a compress on the child's neck and began to clean up. She also told Sergeant Patterson that her family took the baby to the hospital before she had a chance to tell them what had occurred. Appellant was not advised of her rights pursuant to Miranda v. Arizona, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966), prior to this interview.

Almost four hours later, at 8:00 p.m., a different set of officers (Detective Richard Boyle and Detective Kim Johnson) went to Appellant's hospital room with a warrant for her arrest. The audio recording reveals that, upon entering the room, Detective Boyle informed Appellant she was under arrest and then immediately read her the Miranda rights. Appellant said she understood her rights and agreed to speak to the detectives without having an attorney present. The recording indicates that Appellant responded to the detectives' questions for approximately one hour and fifteen minutes.

7

Though Appellant repeated the general story that she had initially told Sergeant Patterson, the detectives asked more probing and detailed questions during this subsequent interview, and Appellant provided more information in response to these questions. Specifically, Appellant discussed: the identity of the child's father and his lack of knowledge regarding her pregnancy; her lack of prenatal care and treatment during her pregnancy; hiding her pregnancy from her family; the events that had occurred earlier in the day, including that she had experienced contractions "off-and-on" throughout the entire day; interactions she had with her family after the baby was born; her alleged lack of a motive to injure or kill her child; and a description as to how she held and swung the knife as she, allegedly, cut the umbilical cord. The detectives also confronted Appellant with the physical evidence, including the number and locations of the stab wounds, the presence of two bloody knives in her bedroom, and the disposal of the body in a trash bag with bloody bedding. In response, Appellant denied cutting the child more than once, denied intentionally placing the infant in a trash bag, and denied any knowledge of a second knife. She remained adamant that the one injury she caused was purely accidental.

8

After the hearing, the trial court issued an order admitting both statements at trial, finding the first statement to be noncustodial, and further concluding that both statements were made freely and voluntarily. The State played both audio-recorded interviews for the jury at trial over Appellant's continued objection. This, Appellant claims, was error. Pretermitting whether the trial court erred in finding the first statement to be noncustodial in nature, we conclude that, because both statements were voluntary, and because the police did not engage in an improper "two-step" interrogation, the second statement was properly admitted at trial. Thus, even if the first statement was erroneously admitted in the State's case-in-chief, the second statement was properly admitted and rendered harmless any error related to the admission of the first statement.

(a) *Voluntariness*

It is well established that in order for a statement to be admitted against a defendant at a criminal trial, "[an] accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." <u>Miranda</u>, 384 U. S. at 467. Generally, whether custodial statements are admissible at trial depends upon whether a suspect was read his <u>Miranda</u>

rights, in that the "failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained. Conversely, giving the warnings and getting a waiver has generally produced a virtual ticket of admissibility." (Footnote omitted.) Missouri v. Seibert, 542 U. S. 600, 608-609 (124 SCt 2601, 159 LE2d 643) (2004) (plurality opinion). However, an officer's failure to read the Miranda warnings to a suspect who is in custody "does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised." Oregon v. Elstad, 470 U. S. 298, 310 (105 SCt 1285, 84 LE2d 222) (1985). Indeed, "there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of Miranda, was voluntary," because "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings." Elstad, 470 U. S. at 318. "Thus, because 'the Miranda presumption does not necessarily constitute a finding that the statement was coerced, . . . statements obtained in violation of the procedural requirements

10

of <u>Miranda</u> may be found otherwise voluntary under due process standards.'"

(Citation and punctuation omitted.) <u>State v. Troutman</u>, 300 Ga. 616, 618

(797 SE2d 72) (2017).

The Eleventh Circuit Court of Appeals has explained:

> In determining whether a properly warned confession is admissible where the defendant has first given an unwarned or improperly warned confession, we turn to the Supreme Court's decisions in <u>Oregon v. Elstad</u>, 470 U. S. 298 (105 SCt 1285, 84 LE2d 222) (1985), and <u>Missouri v. Seibert</u>, 542 U. S. 600 (124 SCt 2601, 159 LE2d 643) (2004). <u>Elstad</u> sets out the general rule that the existence of a pre-warning statement does not require suppression of a post-warning statement that was knowingly and voluntarily made, 470 U. S. at 309 (105 SCt at 1293), while <u>Seibert</u> sets out an exception for situations where police employ a deliberate "question first" strategy. 542 U. S. at 617 (124 SCt at 2613).

<u>United States v. Street</u>, 472 F3d 1298, 1312 (11th Cir. 2006). In order to

determine whether the second statement was voluntary, "courts are not to

presume that the existence of the earlier unwarned statement compelled the

defendant to give another one, but instead should assume that ordinarily

giving proper <u>Miranda</u> warnings removes the effect of any conditions

requiring suppression of the unwarned statement." <u>Street</u>, 472 F3d at 1313.

Here, the entire 17-minute exchange of the first interview was calm and

civil; there is no evidence that Appellant was threatened, coerced, or given a

hope of a benefit in exchange for this statement. The second statement was taken almost four hours later by a different set of officers. Prior to asking any questions, and without any reference to the first interview, the officers informed Appellant that she was under arrest and read the <u>Miranda</u> warnings. Thereafter, Appellant indicated that she understood her rights and wished to voluntarily waive the same in order to speak with law enforcement. "Whatever the reason for [Sergeant Patterson's] oversight, the [first interview] had none of the earmarks of coercion. . . . Nor did the [second set of] officers exploit the unwarned admission to pressure [Appellant] into waiving [her] right to remain silent." <u>Elstad</u>, 470 U. S. at 316. Accordingly, because both statements were voluntarily made, the second statement was properly admitted at trial. See <u>Livingston v. State</u>, 264 Ga. 402, 408 (444 SE2d 748) (1994) ("[I]f the suspect made the initial statement voluntarily, the fact that it was not preceded by <u>Miranda</u> warnings will not taint a subsequent voluntary statement which had the benefit of those warnings.").

(b) *<u>Seibert's</u> "Two-Step" Interrogation*

Appellant further argues that her statement was inadmissible because it was the product of the "question first" or "two-step" interrogation tactic

12

disapproved of by the United States Supreme Court in <u>Seibert</u>,[4] and by this Court in <u>State v. Pye</u>, 282 Ga. 796 (653 SE2d 450) (2007). This argument was not raised below, and thus is not preserved for review by this Court. In any event, the argument is meritless.

"In deciding whether the agents used the 'question first' tactic . . . we consider the totality of the circumstances including 'the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and post-warning statements.'" <u>Street</u>, 472 F3d at 1314 (quoting <u>United States v. Williams</u>, 435 F3d 1148, 1159 (9th Cir. 2006)). There is no evidence that Sergeant Patterson deliberately withheld reading Appellant her <u>Miranda</u> rights in order to solicit a full confession from Appellant, then read her the <u>Miranda</u> rights and asked her to repeat the pre-<u>Miranda</u> admission. See <u>Street</u>, 472 F3d at 1314; <u>State v. Folsom</u>, 286 Ga. 105, 110 (686 SE2d 239) (2009). Moreover,

---

[4] As explained by the Eleventh Circuit in <u>Street</u>, "[b]ecause <u>Seibert</u> is a plurality decision and Justice Kennedy concurred in the result on the narrowest grounds, it is his concurring opinion that provides the controlling law." 472 F3d at 1313 (citing <u>Romano v. Oklahoma</u>, 512 U. S. 1, 9 (114 SCt 2004, 129 LE2d 1) (1994); <u>Marks v. United States</u>, 430 U. S. 188, 193 (97 SCt 990, 51 LE2d 260) (1977)).

based upon the thorough questioning by Detectives Boyle and Johnson, which took place approximately four hours after Appellant gave her original statement, Appellant provided more details and information in her second statement than what was covered in her brief pre-Miranda conversation with Sergeant Patterson. See Fennell v. State, 292 Ga. 834, 836 (741 SE2d 877) (2013) (finding officers did not use improper two-stage interrogation technique where "the post-Miranda interrogation differed not only in the completeness and detail of the questions asked by the detectives but also in the content of appellant's statements"). Compare Pye, 282 Ga. at 801-802 (statement made as a product of improper two-stage technique where initial pre-Miranda questions led to defendant "implicating himself in the crimes, and then, without any break in the proceedings, was given Miranda warnings, . . . and gave a statement that was essentially identical to the version of events he had already revealed to the detectives"). Because the record is devoid of any evidence that law enforcement utilized the "two-step" interrogation tactic "in a calculated way to undermine the Miranda warning," Elstad's general rule controls. See Seibert, 542 U. S. at 622 (Kennedy, J., concurring) (post-warning statements are "governed by the principles of

Elstad unless the deliberate two-step strategy was employed"). Consequently, the trial court did not abuse its discretion in admitting Appellant's second statement at trial.

(c) *Harmless Error*

Because we have concluded that the second statement was properly admitted, any error that may have occurred by admitting the first statement would be harmless beyond a reasonable doubt, and therefore would not require reversal. See Chapman v. California, 386 U. S. 18, 24 (87 SCt 824, 17 LE2d 705) (1967) (holding that, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"). As discussed above, Appellant's first statement was somewhat self-serving in that it cast the entire incident as an accident and discussed Appellant's attempt to give the newborn physical aid. Moreover, the second statement repeated the general content of the first interview and went into far more detail about the incident, about inconsistencies between Appellant's statement and the physical evidence, about Appellant's failure to obtain prenatal care, about her efforts to hide her pregnancy, and about Appellant's culpability. Accordingly, any error in the

15

admission of the first statement was harmless.  See <u>Ellington v. State</u>, 292 Ga. 109 (2) (735 SE2d 736) (2012); <u>Jackson v. State</u>, 272 Ga. 191 (3) (528 SE2d 232) (2000) (admission of non-Mirandized statements harmless error where defendant admitted to committing the crimes in a subsequent, videotaped interview after receiving <u>Miranda</u> warnings and the trial court found the statement to be freely and voluntarily given).

<u>Judgment affirmed.  All the Justices concur, except Benham and Grant, JJ., who concur specially.</u>

BENHAM, Justice, concurring specially.

I write because I respectfully disagree with any suggestion that the first police interview was custodial.

> A person is considered to be in custody and Miranda[5] warnings are required when a person is (1) formally arrested or (2) restrained to the degree associated with a formal arrest. Unless a reasonable person in the suspect's situation would perceive that [she] was in custody, Miranda warnings are not necessary. Thus, the [relevant] inquiry is how a reasonable person in [appellant's] position would perceive [her] situation.

(Citations and punctuation omitted.)  State v. Folsom, 285 Ga. 11 (1) (673 SE2d 210) (2009).   The determination of whether a suspect is "in custody" turns on an objective view of the circumstances attending the interview, not the subjective beliefs of the officer or the suspect.  See Bell v. State, 280 Ga. 562 (2) (629 SE2d 213) (2006).  See also State v. Folsom, supra, 285 Ga. at 13.   "Unless clearly erroneous, a trial court's findings as to factual determinations and credibility relating to the admissibility of the defendant's statement at a Jackson v. Denno hearing will be upheld on appeal."  (Citation omitted).   Humphreys v. State, 287 Ga. 63 (6) (694 SE2d 316) (2010). Inasmuch as there has been no showing of clear error committed by the trial

_____

[5] Miranda v. Arizona, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

court, I do not agree with the majority's decision to pretermit the issue of whether appellant was in custody at the time of the first interview or to resolve the admission of appellant's statement at trial as harmless error.

The facts show appellant gave birth in secret in the midmorning hours of November 1, 2012, fatally stabbed her newborn infant, and placed him in a trash bag. She was cleaning up her bedroom when her family members confronted her about her strange behavior and blood they saw in the bathroom, in her bedroom, and on her person. Appellant went to the hospital with her parents only at the urging of her family, but still failed to mention anything about the infant. After appellant was on her way to the hospital, her sister Bethany found the fatally wounded infant in a trash bag, and her sister Ginger called police.

As part of their investigation of the infant's death, officers went to where the evidence and witnesses were located — (1) the house where the child died and where appellant's sisters were located and (2) the hospital where appellant, appellant's parents, and appellant's medical providers were located. Sergeant Patterson testified he arrived at the hospital at about 1:45 in the afternoon and interviewed each of appellant's parents separately, as

2

well as interviewed some doctors and nurses. After concluding those interviews sometime around 4:00 that afternoon, Sergeant Patterson went to appellant's hospital room to speak with her. At that point, appellant was sleeping and a female officer was inside appellant's hospital room. On the audio recording of the first interview, one can hear a door opening, Sergeant Patterson asking the female officer to leave the room, and the door closing. On the recording, Sergeant Patterson also asks appellant if she is awake, finds a light to turn on in the room, and proceeds to interview appellant for about 17 minutes. Sergeant Patterson testified that at the conclusion of the interview, he and the female officer left the hospital. For the next several hours following the first interview, there was no police presence around appellant ostensibly because, as Sergeant Patterson testified, and which testimony the trial court found to be credible, appellant was not under arrest at any time prior to the second interview.

The crux of appellant's argument on appeal is that awakening to a police officer in her hospital room would make a reasonable person believe she was in custody for the purpose of receiving <u>Miranda</u> warnings. I disagree. Our appellate courts have held that a person who is suspected of a

crime is not in custody for the purpose of receiving <u>Miranda</u> warnings simply because she is approached and questioned by police in a hospital while receiving treatment. See, e.g., <u>Freeman v. State</u>, 295 Ga. 820 (3) (764 SE2d 390) (2014); <u>Jennings v. State</u>, 282 Ga. 679 (3) (653 SE2d 17) (2007); <u>Robinson v. State</u>, 278 Ga. 299 (2) (602 SE2d 574) (2004); <u>Mosely v. State</u>, 269 Ga. 17 (3) (495 SE2d 9) (1998); <u>Taylor v. State</u>, 337 Ga. App. 486 (4) (a) (i) (788 SE2d 97) (2016); <u>Davis v. State</u>, 320 Ga. App. 753 (2) (740 SE2d 707) (2013); <u>Meadows v. State</u>, 264 Ga. App. 160, 166-167 (6) (590 SE2d 173) (2003); <u>Turner v. State</u>, 241 Ga. App. 431 (1) (526 SE2d 95) (1999).[6] Nothing in the record of this case requires a different result. The female officer did not testify at the <u>Jackson-Denno</u> hearing and so there is a dearth of

---

[6] The handful of cases in which our appellate courts have determined that a defendant, who is receiving medical treatment in a hospital setting, is in custody and therefore entitled to <u>Miranda</u> warnings, have involved some overt action by the police limiting the defendant's ability to leave. See, e.g., <u>Clay v. State</u>, 290 Ga. 822 (1) (A) (1) (725 SE2d 260) (2012) (trial court authorized to find defendant was in custody when he woke up to an officer in his hospital room, and the officer avoided his questions as to whether he would be charged, told him he needed to answer questions at the police station, and arranged for the defendant's transport from the hospital to the police station); <u>State v. Carder</u>, 301 Ga. App. 901 (1) (689 SE2d 347) (2009) (trial court authorized to find the defendant was in custody where, at the investigating officer's direction, the hospital staff prevented defendant from leaving the hospital); <u>Mayberry v. State</u>, 267 Ga. App. 620, 623 (600 SE2d 703) (2004) (defendant was in custody where police handcuffed him to a gurney in the ambulance and handcuffed him to his hospital bed).

evidence in the record about her activities, such as exactly when she arrived at the hospital, how and when she entered appellant's hospital room, whether she went in and out of the room, or what she said, if anything, to appellant about her presence and/or purpose. Furthermore, the record does not show that *any* law enforcement officer did anything to limit appellant's ability to leave the hospital prior to her second interview. The record shows appellant remained in her room for medical treatment. Although Sergeant Patterson testified that the female officer's purpose was to "maintain . . . where [appellant] was at," it is not clear whether this meant the female officer was to specifically prevent appellant from leaving the hospital or merely to be aware of where appellant was so officers could find her when they were ready to talk to her. More importantly, there is no evidence that the female officer's mission, whatever it was, was ever communicated in any way to appellant. The question of whether a person was in custody focuses on "how a reasonable person in [appellant's] position would perceive [her] situation" and, thus, does not concern any undisclosed subjective intent of the officer. Sosniak v. State, 287 Ga. 279 (1) (A) (695 SE2d 604) (2010).[7] Here, there

---

[7] In Sosniak, the defendant was handcuffed at his home and transported to the police station in a police car for an interview. He was released from handcuffs and

5

was simply nothing the police did or said to appellant, either prior to or during her first interview, that would have caused her reasonably to perceive she was in custody. Id.

For these reasons, I would uphold the trial court's determination that appellant was not in custody during the first interview. As such, appellant's arguments regarding the second interview being tainted by the first interview would necessarily be moot. Jennings v. State, supra, 282 Ga. at 681.

I am authorized to state that Justice Grant joins this special concurrence.

---

placed in an unlocked interview room. The detective told him that he just wanted to talk and that he was not under arrest. In these circumstances, we upheld the trial court's conclusion that the defendant was not in custody for the interview, noting that the detective "did nothing that would indicate to Sosniak that he was not free to leave…." Id. at 281.

Decided February 19, 2018.

Murder. Clarke Superior Court. Before Judge Haggard.

Jackie G. Patterson, for appellant.

Kenneth W. Mauldin, District Attorney, Brian V. Patterson, David T. Lock, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Elizabeth H. Brock, Assistant Attorney General, for appellee.